Filed 6/11/25

# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,

Plaintiff and Respondent,

v.

CHRISTOPHER GUY JASSO,

Defendant and Appellant.

S179454

Riverside County Superior Court
INF047207

---

**ORDER MODIFYING OPINION AND
DENYING PETITION FOR REHEARING**

THE COURT:

The opinion in this matter, filed on April 3, 2025, and appearing at 17 Cal.5th 646, is modified as follows.

The first full paragraph on page 683 is modified to read:

Here, the prosecutor did not purport to be reading Pinela's confession to police. The prosecution did not craft questions designed to give the illusion of direct testimony but instead focused on eliciting information within Pinela's personal knowledge. Moreover, any inferences that might be drawn from the exchange between the prosecutor and Pinela

were not devastating to the defense, given the evidence presented at trial. Without any indication that the jury was led to believe they were hearing Pinela's prior statements or that the statements were critical to the prosecution's case, we are unpersuaded that trial counsel rendered deficient performance by failing to object on confrontation grounds. (Cf. *People v. Hillhouse* (2002) 27 Cal.4th 469, 502 ["deciding whether to object is inherently tactical, and the failure to object will rarely establish ineffective assistance"].)

This modification does not affect the judgment. Defendant's petition for rehearing is denied.

# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,
Plaintiff and Respondent,

v.

CHRISTOPHER GUY JASSO,
Defendant and Appellant.

S179454

Riverside County Superior Court
INF047207

April 3, 2025

Justice Kruger authored the opinion of the Court, in which Chief Justice Guerrero and Justices Corrigan, Liu, Groban, Jenkins, and Evans concurred.

PEOPLE v. JASSO

S179454

Opinion of the Court by Kruger, J.

A jury convicted defendant Christopher Guy Jasso of the first degree murder of Carlos Cardona. (Pen. Code, § 187, subd. (a).) The jury found true the special circumstance that Jasso murdered Cardona in furtherance of a robbery. (*Id.*, §§ 190.2, subd. (a)(17), 211.) The jury also found true allegations that Jasso had personally used a firearm in the commission of the crime and personally and intentionally discharged a firearm, causing great bodily injury or death. (*Id.*, §§ 1192.7, subd. (c)(8), 12022.5, subd. (a), 12022.53, subd. (d).) At the penalty phase, the jury returned a verdict of death. The trial court sentenced Jasso to death. The court also imposed a consecutive prison term of 25 years to life on the discharge of a firearm enhancement and imposed and stayed a term of four years on the personal use of a firearm enhancement. This appeal is automatic. (*Id.*, § 1239, subd. (b).) We affirm the judgment of death, but remand for the limited purpose of allowing the trial court to consider whether to strike the firearm enhancements under the terms of Senate Bill No. 620 (2017–2018 Reg. Sess.), which was enacted after judgment was rendered in this case.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Guilt Phase

#### 1. *Prosecution Case*

The prosecution presented evidence showing that, together with an accomplice named Fabian Perez, Jasso robbed

Cardona one night in September 2003. Jasso fatally shot Cardona in the course of committing the robbery.[1]

Carlos Cardona worked as a driver and nighttime dispatcher for Yellow Cab in Indio. Yellow Cab dispatchers, including Cardona, could take fares while taking calls, performing both types of work during the same shift. Drivers typically carried between $25 and $70 in cash to make change. Cardona drove a yellow minivan taxicab.

On September 6, 2003, Cardona started his shift at around 7:45 p.m. Cardona dispatched Yellow Cab driver Renee Corrales to a fare at about 12:08 a.m. that night. Cardona dispatched another Yellow Cab driver, Carlos Torres, to a fare at 12:15 a.m. Corrales called Cardona after dropping off his fare at 12:20 a.m., but Cardona did not answer. At 12:30 a.m., Torres also called Cardona after dropping off his fare, and Cardona did not answer Torres's call either.

At about 12:30 a.m. that night, William Blackburn was smoking outside his daughter's house on Aztec Street in Indio, where he was waiting for a ride from his daughter and son-in-law. While standing outside the house, Blackburn saw a yellow minivan drive past the house, heading north on Aztec Street.

_____

[1] Jasso and Perez were charged together for the robbery and murder of Cardona but tried separately. After Perez's jury found him guilty of first degree murder and found true the robbery-murder special-circumstance allegation, Perez was sentenced to life without the possibility of parole. His conviction was, however, reversed on appeal on the ground that the introduction at trial of Perez's confession to police officers, which had been induced by a false promise of leniency, was prejudicial error. (*People v. Perez* (2016) 243 Cal.App.4th 863 (*Perez*).) This confession was not introduced at Jasso's trial; its validity is not at issue in this case.

The minivan stopped about three houses away from where Blackburn was standing, made a U-turn, and started going south on Aztec. After the cab passed by him again, Blackburn heard "a pop or a bang" but did not make much of it and reentered his daughter's house.

About 10 minutes later, Blackburn left in a car with his daughter and son-in-law. Driving toward the corner of Aztec and Avenue 44, Blackburn and his companions saw a man lying in the middle of the street in front of the minivan taxicab. The minivan's engine was still running, its lights were on, and its front door was open. Blackburn and his companions immediately returned to the house and called 911.

Shortly after the 911 call, police arrived at the scene and found Cardona lying facedown about 20 feet from the minivan, in a pool of blood. Cardona had suffered two gunshot wounds on the right side of his head, which caused his death. Paramedics arrived after the police and took Cardona to a hospital after administering first aid. The first officers to arrive did not see anybody else in the area.

Police found two .25-caliber Winchester shell casings at the scene, one on the driver's seat in Cardona's minivan and another on the street. They also collected a newspaper from the middle seat of the taxicab. Through computer and visual analysis, a fingerprint analyst for the Riverside County Sheriff's Department matched latent fingerprints on the newspaper to Jasso. Police did not find any money, a driver's license, or a wallet on Cardona or inside the taxicab.

Indio Police Department investigators reviewed videotapes from security cameras in two Circle K stores near the crime scene. One of the videotapes showed Jasso walking into

the Circle K, paying for gas, and buying two sodas at about 9:28 p.m. on the night of the murder. Jasso also appeared on footage from the other Circle K store. Footage from that other location showed him getting out of a yellow minivan, walking into the store, asking for matches, and leaving the store. The minivan drove away shortly thereafter, at around 12:16 a.m.

At the time of the murder, Jasso had been living in a mobile home with his girlfriend, Delores Torres; Torres's five children; and Torres's brother, Benjamin Pinela. The mobile home was on a ranch owned by Jack Duke, Torres's stepfather, who lived with his wife in a neighboring office trailer. Duke was acquainted with Manuel Rivera, whom he saw shooting a gun on his ranch. Duke knew Rivera because Rivera had been arrested for trying to cash checks that had been stolen from Duke's garage. Duke had also met Fabian Perez once and knew that Perez drove a dark green or black sedan.

On September 6, 2003, Duke saw Pinela hand Jasso a "silver-colored" object from about 100 feet away. A few days later, Duke asked Pinela what he had done with a gun that he had. Duke testified that Pinela told him "he gave it to Chris [Jasso] and [Jasso] got it dirty. He didn't want it. They threw it away." When investigators interviewed him shortly after the murder, Duke was "pretty sure" that he had seen Pinela give Rivera's gun to Jasso, and that was why he had asked Pinela what he had done with the gun. Duke also told investigators that he had learned from Rivera that the gun was a .25 caliber.

Rivera was arrested and taken to the Indio jail in December 2003. On December 16, 2003, Detective Sergio Carrillo initiated a conversation with Rivera. Detective Carrillo asked Rivera if he knew anything about "a couple of homicides,"

4

including Cardona's murder. Detective Carrillo stated Rivera "told me it was Chris Jasso, and that 'he,' being Chris Jasso, had used [Rivera's] gun." After this initial conversation, Detective Carrillo and his supervisor, Sergeant Richard Banasiak, interviewed Rivera formally. During that interview, Rivera stated that Perez had told him that Jasso had shot a cab driver.

According to Detective Carrillo, Rivera stated that he had been shooting his gun at Duke's ranch about a week and a half before Cardona was murdered. Rivera said he left the gun at Jasso's home after shooting it and left for Phoenix, Arizona. While he was in Phoenix, Rivera spoke with Perez on the phone. Rivera stated that Perez told him not to come back from Phoenix right away. Rivera stated that Perez, whom he described as "one of my closest friend[s]," told him that Jasso had murdered a taxi driver. According to Rivera, Perez told him that he "was in the backseat with [Jasso]" when Jasso shot Cardona. Perez told Rivera that Jasso "told that fool, told that fool cabbie not to move. He moved, so Chris blasted him, boom." When he was asked whether Perez had helped Jasso plan the robbery, Rivera said, "No," but also that Perez said "he would go along with" the robbery. When Sergeant Banasiak asked Rivera whether "[his] buddy [was] totally surprised for what Chris . . . did," Rivera answered, "Pretty much."

When asked to relay exactly what Perez had told him, Rivera said, "He said that Chris had pulled his stuff out, but you know, to jack his ass for the feria because they were hurting for money and shit." Detective Carrillo explained that "[f]eria" means "[c]hange" and "jack" can mean "[b]eat somebody up or take something from somebody." According to Rivera, Perez and Jasso got $80 from the robbery. Rivera also thought that Jasso and Perez had taken the driver's wallet and Jasso got rid of it.

Perez also told Rivera that he had taken the gun apart and thrown it into the Salton Sea.

Detective Carrillo stated that after he and Sergeant Banasiak interviewed Rivera, police went to Duke's ranch to look for .25-caliber shell casings. He and two other investigators found two shell casings at the ranch based on what Rivera had told him.

Phillip Pelzel, a senior criminalist at the California Department of Justice, performed a toolmark analysis of the two shell casings that were recovered at the scene of Cardona's murder and the two casings from Duke's ranch. Pelzel first compared the two casings from the crime scene and concluded that they were likely fired from the same firearm. Pelzel then compared all four shell casings. Pelzel stated that all four casings had "matching firing pin impressions, but — and also the fact that the firing pin punched through the primer." According to Pelzel, matching firing pin impressions were uncommon but insufficient to conclude that the casings came from the same firearm because "there may be another firearm out there that could produce the same marks." Pelzel therefore examined the casings in finer detail, looking for "chamber marks" that might allow him to conclude that the casings were from the same firearm. Pelzel stated, "I did find some [chamber marks] but not enough still to meet the criteria for identification. [¶] So between the matching firing pin impression, matching chamber marks, I concluded that they were probably fired from the same gun, but not an identification to exclude the possibility that some other gun may have fired them."

Jasso was arrested for the robbery and murder on September 10, 2003. That day, his girlfriend, Delores Torres, called Jasso's sister, Jennifer Jasso, and asked her to pick up the wallet Jasso was carrying when he was arrested. Jennifer went to the Indio jail that same day and picked up a black trifold wallet, and Torres got the wallet from Jennifer. When asked about the wallet two days later, Jennifer told Lieutenant William Hall that she did not recall ever seeing that wallet before. But at trial, Jennifer testified that she did recognize the wallet as a wallet that had been given to Jasso by her brother Gabriel.

As the prosecution was nearing the end of its case, Cardona's mother, Maria Cuellar, informed the prosecutor outside of court that police had given her a brown wallet that contained Cardona's Department of Motor Vehicles (DMV)-issued identification card, business or credit cards, and $30–$60 in cash. Before the prosecutor closed his case, the trial court read to the jury a stipulation regarding the wallet. The stipulation described the wallet's contents and stated Cardona's mother thought a detective had given her the wallet but did not recall exactly how she got it.

### 2. Defense Case

Jasso did not present evidence in his defense.

### 3. Jury Verdicts

The jury found Jasso guilty of first degree murder. The jury also found true special allegations that Jasso: (1) personally used a firearm — specifically, a .25-caliber handgun — in the commission of the crime; (2) personally and intentionally discharged a firearm and caused great bodily injury or death to another person; and (3) murdered

7

Cardona in the commission or attempted commission of a robbery.

## B. Penalty Phase

### 1. Prosecution Case

The prosecution's penalty case had three main components. First, the prosecution presented evidence of several violent acts Jasso committed in jail after his arrest. The prosecution presented evidence concerning an assault of inmate Martin Mota on January 1, 2008. Though Mota was called to testify, he said he was afraid of testifying about the incident and that he did not recall if or how he was injured on that date. The parties ultimately agreed to have the following stipulation about Jasso's assault of Mota read to the jury: "Lacey Mejia is employed as a Riverside County Sheriff's deputy. She was assigned to the Robert Presley Detention Center and working on January 1st, 2008. [¶] At approximately 7:50 p.m., she witnessed Christopher Guy Jasso choking inmate Martin Mota. Jasso had his arms around Mota's neck from behind. Jasso was commanded to stop and he complied. The [door] on the [cell] was open so Mota could crawl out, since he is handicapped and unable to walk unassisted. Mota was placed in a wheelchair and checked out by a nurse. [¶] Jasso reported that he saw Mota on the floor of their cell having trouble, so he helped him up. Mota reported that he was sleeping in his wheelchair and woke up to find Jasso looking through his property box. Mota said Jasso stood up, walked over to him, and with his left hand grabbed his hair, and with his right closed fist struck him three times on the side of the face. [¶] Jasso then attempted to choke Mota from behind by wrapping both arms around his neck. Mota reported he did not lose consciousness. After Jasso choked Mota, he

threw him down to the ground and stomped on his lower back with his left foot. [¶] Mota later . . . reported to a defense investigator that he was not in a wheelchair when this happened. He used crutches to assist with walking. [¶] Inmates are allowed to have paperwork and/or legal documents relating to their case[s] in their property or cell. The parties do hereby stipulate that the foregoing is true and correct."

The prosecution presented evidence that Jasso assaulted fellow inmate Fred Garcia on June 6, 2008. After Garcia and another inmate started fighting, Jasso joined the fight. After deputies pepper sprayed and tased the three inmates to break up the fight, Garcia required medical care because of several lacerations to his body. Deputies found a jail-made weapon, or shank, on the floor next to Jasso after the fight. One of the deputies who investigated the fight testified that postattack interviews with Garcia revealed that Jasso had slashed Garcia with the shank after the other inmate took the shank from Garcia.[2] Garcia did not testify about the incident.

The prosecution introduced evidence of Jasso's involvement in another jail fight on January 16, 2009. At the time, Jasso was in a housing unit holding either exclusively or primarily inmates placed in administrative segregation. Inmates are placed in administrative segregation when they cannot be housed with others, typically because of assaults on other inmates or corrections staff. A deputy testified that he saw Jasso and another inmate attacking a third inmate. The inmates were ordered to stop fighting several times, but they did

---

[2] The deputy was allowed to testify about Garcia's out-of-court statements regarding the attack by the parties' stipulation.

not comply.  The deputy testified that he hit Jasso with his taser and activated it.  Of the two taser probes, one had failed to attach to Jasso's body, but the probe that connected gave Jasso a jolt.  Jasso pulled off the probe from his body and started moving toward the inmate he had been attacking again.  The deputy reloaded his taser and fired it at Jasso again, and this time both probes connected and delivered sufficient voltage to incapacitate Jasso.

The prosecution also introduced evidence of Jasso's attack on inmate Jesse Diaz on January 26, 2009.  A deputy stated he saw Jasso hitting Diaz in the face repeatedly, while Diaz was trying to protect himself without fighting back.  Officers were yelling at Jasso to stop, but he did not comply.  The deputy took Diaz to the hospital after he broke up the fight.  Diaz's injuries were significant:  "His whole face was bloody, left and right eyes were swollen.  There was blood coming out of his nose.  His lips were bruised inside, outside."  A second deputy testified that he also witnessed part of the fight and saw Diaz covered in blood and apparently begging for his life while Jasso punched him in the face several times.  After the fight, he spoke with Jasso, who told him Diaz "shouldn't have touched my daughter."  Diaz later told the first deputy that Jasso attacked him because Diaz was charged with having molested Jasso's stepdaughter.

The second deputy testified that he searched Jasso's cell in February 2009 and found a shank and altered razors.

The second main component of the prosecution's penalty case was Jasso's criminal and violent history before the murder. The court read to the jury the following stipulation about Jasso's assault of his cousin, Arturo Lopez:  "On September 9th, 2000, Arturo Lopez, Jr. was taken to the JFK emergency room at 3:28

a.m.   He reported to Indio police officer Rudy LaValle the following:  Lopez was walking down Sonora Street towards his old apartment . . . to use the telephone of a neighbor.   While walking down the street, Chris Jasso started walking with him. Lopez said Jasso pulled out a knife and stabbed him in the arm and back.  [¶]  Lopez jumped a small fence to get away.  He then called a cousin to come and take him to the hospital.  Lopez said he was returning from Fantasy Springs casino and stopped to see a friend.  He did not know why Jasso stabbed him.  They did not argue, and he did not have a problem with Jasso.  Lopez stated he did not want prosecution against Jasso.  [¶]  Lopez sustained a cut to the forearm and a puncture wound in the middle of his back.  Officer LaValle photographed his injuries. The photographs are attached as exhibits.  [¶]  Mr. Lopez does not want to testify against Christopher Jasso because they are cousins.”

The parties also stipulated that Jasso had committed the following prior felonies:  (1) possession of an altered check on December 24, 1992; (2) possession of an altered check on January 7, 1993; (3) possession of a controlled substance on April 16, 1993; (4) grand theft on June 4, 1994; (5) possession for sale of a controlled substance on March 1, 1997; and (6) theft of an access card on July 1, 2000.

The third main component of the prosecution’s penalty case was victim impact testimony from Cardona’s friends and family.  Two of Cardona’s close friends, Anna Ortiz and Nineth Chinchilla, testified about Cardona’s friendliness and willingness to help other people, his love of dancing, and his ability to provide great advice.  Members of Cardona’s family, including his cousin Edwin Cuellar and his aunts Miriam Cuellar and Maria Enriquez, similarly testified that Cardona

was a great friend, a role model, and beloved by everyone who knew him. Edwin, Miriam, and Maria also testified about Cardona's devotion to his mother and how devastating his death had been for her and everyone in the family.

Maria Cuellar, Cardona's mother, testified about what a thoughtful son Cardona had been, always putting her first and planning for the family's future. She described losing Cardona as like having her heart taken from her.

### 2. Defense Case

Jasso's penalty phase case similarly had three main components. The first part of Jasso's penalty case was to provide background for Jasso's violent acts, including the murder of Cardona. Jasso introduced evidence that he had attacked Jesse Diaz because Diaz had molested his stepdaughter. Jasso had warned deputies at the Indio jail not to place Diaz in his proximity because he would attack Diaz if he saw him.

To provide additional background for the attacks, the parties stipulated that: (1) Fred Garcia had eight previous convictions for crimes of moral turpitude; (2) Arturo Lopez had committed crimes of moral turpitude, namely domestic violence and willful harming of a minor child; (3) Mota had been convicted of second degree murder for "an assault on a child under eight resulting in death" and petty theft; and (4) Jesse Diaz was arrested and charged for performing a lewd act with a child under 14 years old.

The parties also agreed to the following stipulation about why Jasso decided to rob a taxicab driver: "The parties hereby stipulate that Detective Banasiak of the Indio Police Department conducted an interview of Fabian Perez regarding

the events of September 6th, 2003. Fabian Perez told Detective Banasiak that the reason Christopher Jasso wanted to rob someone was because Christopher Jasso needed money to buy groceries for his family." Jasso also presented the testimony of clinical psychologist Dr. Kent Franks, who sought to contextualize Jasso's violent conduct as a product of his childhood trauma and his desire to protect and provide for his children.

The second and most extensive component of Jasso's defense case was testimony from his close relatives, who described the violent, abusive environment in which Jasso grew up and presented him as a protector of his mother and siblings and a loving father figure to children from his long-term relationships with three women.

Frances Mascorro, Jasso's mother, recounted that though she and Jasso's father, George Jasso, Sr., never married, they had four children together. Jasso was born first, in 1972, followed by Cruz, George, Jr., and Jennifer. Frances had a fifth child, Gabriel, with another man. She and George, Sr., lived with his parents before Jasso was born, but then they started receiving welfare and started living on their own.

Frances testified that she had a poor memory because George, Sr., had hit her repeatedly, particularly when he was drunk. He would often force Frances to give him food stamps so that he could trade them for money to buy alcohol. George, Sr., also took hard drugs like cocaine and heroin. Once, he threatened her by putting a gun to her head while she was holding Jennifer. On another occasion, George, Sr., broke Frances's leg, broke vases on her back, and beat her with a large industrial mop in front of the children. Frances sustained

severe injuries as a result of some of the beatings, including black eyes, a broken nose, broken teeth, and broken ankles. She had her own drinking problem and suffered from depression.

George, Sr., also abused their children, kicking them with steel-toed boots or hitting them with belts. When Jasso was about seven, George, Sr., began to lock Jasso in a room and beat him. According to Frances, George, Sr., was jealous of Jasso and wanted all of her attention and love for himself. As Jasso got older, he began to confront his father and try to protect his mother. George, Sr., would sometimes break windows or doors wherever Frances and the children were staying, prompting Frances or her neighbors to call police. The family had to move constantly because they had no money and landlords would evict them after George, Sr., caused damage to the properties.

Frances testified that Jasso left home as a teenager, but he would often come back and give the family money for food and their other needs. Frances thought that her son "had a good heart" and always took responsibility and cared for his family, including his father. She said Jasso was a loving father to his children and "always worried" about them. She said she corresponded and spoke with Jasso while he was in custody.

Jasso's brothers, George, Jr., and Cruz, also testified. At the time, George, Jr., was serving a life sentence for murder. Cruz was living with Frances and Jennifer, Jasso's sister, after serving two and a half years in jail. Like Frances, they testified that their father was violent and that the family was always moving from hotel to hotel or apartment to apartment because they had no money for rent and kept getting evicted. They described Jasso's efforts to help the family since he was a young child, which included taking odd jobs to help with expenses and

trying to protect his mother and siblings from his father's violence.

Jasso's sister Jennifer, his cousin Ricardo Jimenez III, and his uncle Ricardo Jimenez, Jr., similarly testified about Jasso's violent upbringing and Jasso's efforts to protect his mother and siblings. Jennifer also described Jasso as a caring, loving father to his children.

Jasso's former wife, Tanya, whom he had married when he was 18, testified that she was pregnant with her first child when they met and married. Tanya and Jasso had three children together, and during their marriage Tanya also gave birth to a son with a different father. Tanya described Jasso as a caring, involved father to all five children. Jasso spent significant stretches of time away from Tanya and the children while they were together because he was in custody. All five children similarly described Jasso as a caring father who provided valuable guidance even while in custody.

Sherrin Juarez was Jasso's girlfriend after his relationship with Tanya ended. She testified that during the three or four years in which they were together, Jasso stayed at home and took care of her two daughters while she worked. Sherrin's two daughters testified that Jasso was a father to them because he helped them with homework, would take them to the park and school, and consoled them when their biological father disappointed them.

Four children of Jasso's third long-term partner, with whom he was living at the time of the charged offenses, also testified that Jasso was like a father to them. They testified they continued to talk and correspond with him to get his advice even after his arrest.

The third main component of Jasso's penalty case was expert testimony from a clinical psychologist, Dr. Kent Franks. Dr. Franks evaluated, tested, and diagnosed Jasso. He spent 24 hours with Jasso over three days; interviewed Jasso's family; read reports produced by schools, police, and public defenders throughout Jasso's life; and reviewed his personal history.

Dr. Franks described Jasso's early life as "[v]ery, very difficult," marked by "supreme poverty" and frequent family displacement and dysfunction. He said that such family dysfunction and frequency of movement create behavioral difficulties for children by disrupting their peer relationships and increasing their risk of psychological problems and tendency to behave aggressively. The constant physical and verbal abuse Jasso's father inflicted on him damaged Jasso's self-esteem and left him vulnerable to depression. This abuse contributed to Jasso's poor academic performance, made him extremely self-conscious, and led him to see failure as more comfortable and natural than success. It made Jasso more vigilant, self-protective, and protective of his family.

Dr. Franks diagnosed Jasso with attention deficit hyperactivity disorder and that Jasso used methamphetamines, likely as a way of self-medicating. Dr. Franks also opined on the causes of Jasso's criminal activities. According to Dr. Franks, Jasso's criminal fraudulent activities were motivated by Jasso's desire to provide for his family or take the family on vacation. As for Jasso's violent behavior in custody, Jasso wanted to avoid trouble in jail and had requested to be placed in protective custody to avoid violent encounters. According to Dr. Franks, Jasso had resorted to violence in jail in response to other inmates' attacks or other provocations.

Dr. Franks recounted his conversation with Jasso about Cardona's murder. He said Jasso admitted to him that he had shot Cardona and expressed remorse over it. Jasso told Dr. Franks that he did not plan or expect to shoot the taxicab driver but shot him after he put up a struggle when Jasso told him to give him money. Jasso said he was desperate and wanted to provide for his family. According to Dr. Franks, Jasso appeared to take responsibility for the murder. Jasso also admitted to Dr. Franks that he had committed numerous other offenses before the murder.

Dr. Franks opined about Jasso's attitudes toward others and his personality. He noted Jasso's tendency to form close emotional relationships with women and devote himself to children. Although Jasso tended to develop close and empathetic relationships with women and children, he had significant psychological problems. According to Dr. Franks, Jasso exhibited an "extremely complex" psychological profile. Jasso understood that he was psychologically scarred and did not anticipate succeeding in life, which made him "depressed and ruminative." Jasso's testing indicated he posed a significant risk of suicide and experienced an overwhelming amount of stress. Dr. Franks explained that Jasso's thinking was relatively clear, however, and he was not psychotic even though he had trouble controlling his emotions. He also explained that Jasso did not fit the profile of an antisocial person because he was capable of forming empathetic relations with others and was sensitive to the emotional needs of people he cared about.

Dr. Franks diagnosed Jasso with having a "Not otherwise specified" personality disorder, because he exhibited antisocial behavior but was not a psychopath. He said that even though Jasso tended to avoid larger social groups, his empathetic bonds

17

with people he was familiar with and his ability to experience guilt and remorse indicated that he did not have antisocial personality disorder. Dr. Franks also diagnosed Jasso with posttraumatic stress disorder (PTSD). He said Jasso's extreme anxiety and vigilance were the products of his abusive upbringing. Dr. Franks linked Jasso's PTSD with the murder, stating Jasso was predisposed to become aggressive and self-protective whenever he perceived hostility from another person. When examined by the prosecutor, Dr. Franks admitted that much of Jasso's conduct and profile matched clinical criteria for antisocial personality disorder. Dr. Franks also stated that antisocial personality disorder cannot be cured, but its symptoms can be ameliorated with behavioral therapy.

### 3. Penalty Phase Verdict and Sentence

The jury returned a death verdict. Jasso moved for a new trial on the ground that the court had erroneously admitted Fabian Perez's statements to Manuel Rivera. The court denied the motion for a new trial, denied an automatic motion for modification of the verdict, and imposed a sentence of death.

## II. DISCUSSION

### A. Guilt Phase Issues

### 1. Admission of Fabian Perez's and Manuel Rivera's Hearsay Statements

Jasso's primary contention on appeal is that the trial court committed reversible error when it permitted Detective Sergio Carrillo to testify about hearsay statements made by Jasso's accomplice, Fabian Perez, to Manuel Rivera, and which Rivera subsequently told Carrillo. Based on the record before us, we find no reversible error.

### a. Factual Background

The information filed in this case alleged that Jasso and Perez committed first degree murder with the special circumstance that they were engaged in or attempting to engage in robbery when they committed the murder. The trial court severed the defendants' trials. In his trial brief, the prosecutor argued that Perez's statements to his friend Manuel Rivera about his and Jasso's involvement in the murder were admissible against Jasso as declarations against interest. (See Evid. Code, § 1230.) In motions in limine dated September 28 and 29, 2009, Jasso moved to exclude Perez's statements, arguing that the statements were inadmissible under the confrontation clause (U.S. Const., 6th Amend.) and that they were not admissible as declarations against interest because they pinned most of the blame on Jasso and minimized Perez's role in the murder.

The court addressed the admissibility of Perez's statements during hearings held on October 5 and 6, 2009, while jury selection was underway. The trial court agreed with the prosecutor and tentatively overruled Jasso's objections on the ground that Perez's statements were admissible declarations against his penal interest. The court reserved final judgment on the issue, however, until after the court had the opportunity to probe Rivera's credibility and the sources of his knowledge about the murder in an evidentiary hearing.

On November 6, 2009, still during jury selection, the trial court asked the prosecutor what he wanted to do with Rivera. The prosecutor stated, "I remember the Court wanted to hear from Mr. Rivera so we could make a determination as to his source of knowledge as to his statement; what he learned from

Mr. Perez and what he may have learned from other sources. [¶] So we were going to pose those questions to him and see if we could delineate out what Mr. Perez told him as opposed to what he may have learned from other people." The court agreed that a hearing was needed, noting that "[t]here's some statements that are made in the transcript where it's unclear where he's getting the information."

When the evidentiary hearing was held on November 9, 2009, Rivera repeatedly denied remembering the interview with Detective Carrillo and Sergeant Banasiak where he recounted what Perez had told him about the murder, even after the prosecutor played him a tape of the interview. The trial court held Rivera in contempt after he refused to answer the prosecutor's questions about the interview. While Rivera was being removed from the courtroom, the prosecutor and Jasso's counsel had an off-record exchange. After that exchange, the prosecutor told the court that he and Jasso's counsel had been discussing how to find "a way around" Rivera's refusal to answer. The prosecutor requested the court's opinion on whether they should parse Rivera's statements line by line, play a tape of the interview, or have Detective Carrillo testify about what Rivera had told him. Jasso's counsel stated that he thought "it would be cleaner and neater" if Detective Carrillo answered specific questions about the interview transcript on the stand, "avoid[ing] all the areas that might have been redacted otherwise." The parties agreed that the defense then would be allowed to impeach Rivera by having a stipulation describing Rivera's prior convictions read to the jury.

The prosecution started its case on November 16, 2009. Three days later, the prosecution called Rivera to the stand, after the jury had been read a stipulation of Rivera's felony

convictions and crimes of moral turpitude. Rivera refused to answer any questions. The trial court held him in contempt and excused him.

The prosecution then called Detective Carrillo. Detective Carrillo testified about several aspects of his investigation of Cardona's murder, including the interview that he and his supervisor, Sergeant Banasiak, conducted with Rivera. Specifically, Detective Carrillo testified that in the interview, Rivera reported what Perez had told him on the phone after the murder, while Rivera was away in Phoenix, Arizona. Rivera said that he and Perez had been friends since they were eight and described him as "one of my closest friend[s]." Rivera stated that Perez told him not to come back from Phoenix right away. Perez told him that Jasso had murdered a taxi driver. Perez said that he "was in the backseat with [Jasso]" when Jasso shot Cardona. According to Perez, Jasso "told that fool, told that fool cabbie not to move. He moved, so Chris blasted him, boom." Rivera said that Perez had first told him about the murder in that phone conversation and revealed additional details in conversations spanning "almost a month."

Rivera denied that Perez had helped Jasso plan the robbery, but he stated Perez said "he would go along with it." According to Rivera, Perez said that Jasso committed the robbery and murder because they "were hurting for money," but that he was "totally surprised" when Jasso shot Cardona. Rivera also stated that Perez reported that he and Jasso took $80 from Cardona and admitted that he personally disassembled and disposed of the murder weapon.

Detective Carrillo also testified about additional matters he discussed with Rivera, other than Rivera's conversations

with Perez. Carrillo stated that Rivera told him he "did some shooting" with his gun at Duke's ranch — where Jasso lived — and that Rivera directed him to where he could find shell casings at the ranch. After that, Detective Carrillo and two other investigators secured a warrant to search the ranch and found two empty shell casings in the soil where Rivera said they would be able to find them.

### b. *Admissibility of Fabian Perez's Statements to Manuel Rivera*

The primary issue Jasso raises concerns the admission of Perez's statements about the crime. The statements came in through two layers of hearsay, and thus were admissible only if each layer of hearsay separately met the requirements of a hearsay exception. (Evid. Code, §§ 1200, 1201.) Jasso argues that the trial court erred in ruling that the first layer of hearsay — Fabian Perez's statements to Manuel Rivera — fell within the hearsay exception for statements against the declarant's interest. (*Id.*, § 1230.) We find no reversible error in this ruling.

### i. *Legal Background*

Although hearsay statements are generally inadmissible as evidence (Evid. Code, § 1200, subd. (b)), California law recognizes several exceptions to this rule. One exception allows the admission of any statement that "when made, was so far contrary to the declarant's pecuniary or proprietary interest, or so far subjected him to the risk of civil or criminal liability, or so far tended to render invalid a claim by him against another, or created such a risk of making him an object of hatred, ridicule, or social disgrace in the community, that a reasonable man in his position would not have made the statement unless he

believed it to be true." (*Id.*, § 1230.) We have explained that, "[a]s applied to statements against the declarant's *penal* interest, in particular, the rationale underlying the exception is that 'a person's interest against being criminally implicated gives reasonable assurance of the veracity of his statement made against that interest,' thereby mitigating the dangers usually associated with the admission of out-of-court statements." (*People v. Grimes* (2016) 1 Cal.5th 698, 711, italics added (*Grimes*), quoting *People v. Spriggs* (1964) 60 Cal.2d 868, 874.)

"To demonstrate that an out-of-court declaration is admissible as a declaration against interest, '[t]he proponent of such evidence must show that the declarant is unavailable, that the declaration was against the declarant's penal interest when made and that the declaration was sufficiently reliable to warrant admission despite its hearsay character.' [Citation.] 'In determining whether a statement is truly against interest within the meaning of Evidence Code section 1230, and hence is sufficiently trustworthy to be admissible, the court may take into account not just the words but the circumstances under which they were uttered, the possible motivation of the declarant, and the declarant's relationship to the defendant.' " (*Grimes*, *supra*, 1 Cal.5th at p. 711.) The exception to the hearsay rule codified in Evidence Code section 1230 does not apply " 'to evidence of any statement or portion of a statement not itself specifically disserving to the interests of the declarant.' " (*People v. Duarte* (2000) 24 Cal.4th 603, 612 (*Duarte*), quoting *People v. Leach* (1975) 15 Cal.3d 419, 441 (*Leach*).) "We review a trial court's decision whether a statement is admissible under Evidence Code section 1230 for abuse of discretion." (*Grimes*, at p. 711.)

### ii. Discussion

With these principles in view, we consider whether the trial court reasonably concluded that Perez's statements were admissible under Evidence Code section 1230 because they were, in the context in which they were made, "specifically disserving" of his penal interest and sufficiently trustworthy to merit admission. (*People v. Samuels* (2005) 36 Cal.4th 96, 121 (*Samuels*).)

Jasso's central contention is that Perez's statements were inadmissible because they were overwhelmingly self-serving. Jasso characterizes Perez as pointing the finger at Jasso while describing himself as an innocent bystander who just went along with Jasso's crime, denied planning it, and claimed that he was surprised when Jasso shot Cardona.

Contrary to Jasso's characterization, much of Perez's account was inculpatory. As the trial court noted, while Perez's account placed the greater share of blame on Jasso, Perez nonetheless implicated himself in several criminal acts. While Perez did not admit to planning the robbery, he did say that "he would go along with it" and admitted to Rivera that he and Jasso robbed a taxicab driver "because they were hurting for money." Perez further told Rivera that after Jasso shot the driver, Perez disassembled the gun himself and disposed of it in the Salton Sea. Perez also told Rivera that he and Jasso reaped "80 bucks" in proceeds from the robbery. As the trial court correctly noted, the central elements of Perez's story — that he willingly participated in a robbery of a taxicab driver, watched Jasso shoot the driver, disassembled and disposed of the murder weapon, and shared in the proceeds of the robbery — all exposed Perez to liability for serious crimes, including both robbery and

murder. (See *People v. Cavitt* (2004) 33 Cal.4th 187, 197 [explaining the version of the felony-murder rule then in force held nonkillers who participated in the underlying felony "strictly responsible for any killing committed by a cofelon, whether intentional, negligent, or accidental, during the perpetration or attempted perpetration of the felony"][3]; Pen. Code, § 32 [accessory after the fact]; *People v. Tran* (2013) 215 Cal.App.4th 1207, 1218–1219 (*Tran*) [declarant's statement to a friend that he watched the defendant shoot someone then helped the defendant burn his car was admissible as a statement against interest].)

The trial court also reasonably concluded that the circumstances surrounding the statements to Rivera weighed in favor of finding them admissible as statements against interest because they bore indicia of trustworthiness. Perez did not make the statements to police, but to Rivera, a close friend since childhood. According to Rivera, Perez first told him about the robbery and murder over the phone while Rivera was in Phoenix, evidently to let Rivera know what had happened to his gun, and the whole story "took about almost a month to hear."

---

[3]     Perez made his statements in 2003. More than a decade later, the Legislature would significantly narrow the felony-murder rule. Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill 1437; Stats. 2018, ch. 1015), which became effective on January 1, 2019, "limited the scope of the felony-murder rule . . . 'to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.' " (*People v. Delgadillo* (2022) 14 Cal.5th 216, 223, quoting Stats. 2018, ch. 1015, § 1, subd. (f), citations omitted.) The later legislative amendments do not, however, affect our inquiry into whether the statement was against Perez's interest at the time it was made.

Even if Perez placed greater blame on Jasso than himself, the fact that he made his statements not to the authorities in an interrogation but to a close friend — first on the phone and then piecemeal over the course of a month — suggests that Perez did not identify Jasso as the shooter in an attempt to shift blame or curry favor with authorities. (See *Tran, supra*, 215 Cal.App.4th at pp. 1217, 1220; *People v. Arceo* (2011) 195 Cal.App.4th 556, 577; *People v. Cervantes* (2004) 118 Cal.App.4th 162, 175; see also *People v. Greenberger* (1997) 58 Cal.App.4th 298, 335 [noting that in determining whether a statement is trustworthy and falls within the declaration against interest exception, "the most reliable circumstance is one in which the conversation occurs between friends in a noncoercive setting that fosters uninhibited disclosures"]; cf. also, e.g., *U.S. v. Dupree* (2d Cir. 2017) 870 F.3d 62, 80 [statements inculpating both the declarant and the defendant are more trustworthy when made to a perceived friend].)

Jasso speculates that Perez might have given Rivera his story anticipating that police might question Rivera about the murder, and so told him a version of events that exculpated him in comparison to Jasso. But Jasso's suggestion does not add up: If Perez was trying to give an account that would cast him in the most favorable light for the benefit of law enforcement, why confess to participating in the robbery at all, or to having knowingly disposed of the murder weapon? The more reasonable conclusion, which the trial court was entitled to draw, is that Perez told Rivera about the murder because they were friends and Perez felt obligated to let Rivera know what had happened to his gun.

Jasso argues, as he did in the trial court, that the statements were inadmissible because even if some of Perez's

statements were self-inculpatory, their net effect was exculpatory. Jasso relies for this argument on *Duarte*, in which we observed that "a hearsay statement 'which is in part inculpatory and in part exculpatory (e.g., one which admits some complicity but places the major responsibility on others) does not meet the test of trustworthiness and is thus inadmissible.' " (*Duarte*, *supra*, 24 Cal.4th at p. 612.)

Jasso overreads *Duarte*. In *Duarte*, we were concerned with a declarant's confession to police that acknowledged what police already knew — that the declarant had been involved in the crime — but minimized the declarant's role and instead pointed the finger at others. (See *Duarte*, *supra*, 24 Cal.4th at pp. 611–612 [noting a statement is not " 'truly self-inculpatory' " if its purpose is " 'to shift blame or curry favor' " with the authorities].) Given the context, even the declarant's seemingly disserving statements were better understood as attempts to mitigate damage. Here, unlike *Duarte*, there is no indication that Perez was seeking to mitigate the damage to his legal interests when he told his friend, Rivera, that he had participated in a robbery that led to the murder of Cardona. The net effect of the statements, in context, was not exculpatory.

Jasso also argues, relying on *Duarte*, that the trial court erred in admitting " 'collateral assertion[s]' " that were not "specifically disserving" to Perez. (See *Duarte*, *supra*, 24 Cal.4th at p. 612 [explaining that an inadmissible "collateral assertion[]" is " 'any statement or portion of a statement not itself specifically disserving to the interests of the declarant' " (quoting *Leach*, *supra*, 15 Cal.3d at p. 441)].) But as we have made clear, a declarant's statement that inculpates the defendant is not a collateral assertion if it is "inextricably tied to and part of a specific statement against [the declarant's]

penal interest." (*Samuels*, *supra*, 36 Cal.4th at p. 121.) Whether a statement is a collateral assertion not properly admitted as a declaration against penal interest depends not on whose actions it describes, but rather on whether it is an integral part of a statement that inculpates the declarant.

Jasso focuses on Perez's statements about Jasso's shooting of Cardona. But for the reasons explained above, this statement, too, was self-inculpatory: Combined with Perez's description of his own participation in the robbery that led up to the shooting, as well as his deliberate disposal of the murder weapon after the shooting, the statements about Jasso's actions were part and parcel of an overarching admission to criminal acts. This case resembles *Tran, supra*, 215 Cal.App.4th at page 1219, mentioned above, in which the court ruled admissible a declarant's statement to a friend that he helped the defendant burn his car after the defendant had shot someone. The court explained that the "entire statement was compelling evidence that [the declarant] knowingly and purposely assisted defendant in destroying evidence to help defendant escape arrest, prosecution, and punishment for a shooting"; although the assertions about what the defendant had done were not inculpatory considered in isolation, they were "an inextricable part of what made his entire statement . . . contrary to his penal interests." (*Ibid*.; accord, e.g., *State v. Graham* (Conn. 2022) 282 A.3d 435, 445 [where declarant "admitted his participation in a robbery that gave rise to a homicide and exposed himself to the possibility of a charge of felony murder," entire statement — including statements regarding the conduct of the actual shooter — found to be against the declarant's penal interest].) So too here. Perez's statements about what Jasso had done and his own role destroying evidence were, taken together, an

admission exposing Perez to criminal liability and thus specifically disserving of Perez's penal interests.

Other portions of Perez's statements — specifically, that he played no role in planning the robbery and that he was surprised when Jasso shot the taxicab driver — were both self-serving and separable from Perez's specifically disserving statements. In a pretrial motion discussion, Jasso argued that the court "need[ed] to redact" statements that were "not statements against penal interest because the only thing that can come in are statements against penal interest." Assuming this comment was sufficient to preserve his argument that Perez's self-serving statements should have been excluded even if Perez's other statements were admissible, the admission of Perez's self-serving statements was harmless. It is not reasonably probable that excluding the self-serving statements would have made a difference in the outcome, given the far greater significance of the rest of Perez's account as well as the other evidence placing Jasso at the scene of the crime and connecting him to the murder weapon.

Jasso contends that even if Perez's statements to Rivera were admissible under state evidence law, their admission violated Jasso's Sixth Amendment right to confront Perez. The contention is without merit. "The Sixth Amendment right to confrontation applies only to testimonial statements." (*People v. Gray* (2023) 15 Cal.5th 152, 163, fn. 3, citing *Michigan v. Bryant* (2011) 562 U.S. 344, 354.) While the high court has never provided a comprehensive definition of what constitutes a testimonial statement, statements "not made to law enforcement officers" or "otherwise made under circumstances suggesting a primary purpose of creating evidence for . . . prosecution" are not testimonial. (*People v. Rangel* (2016)

62 Cal.4th 1192, 1217, citing *Ohio v. Clark* (2015) 576 U.S. 237, 246.) In addition, to qualify as testimonial, we have said that " ' "the out-of-court statement must have been made with some degree of formality or solemnity." ' " (*People v. Gomez* (2018) 6 Cal.5th 243, 297, quoting *People v. Leon* (2015) 61 Cal.4th 569, 603; see *People v. Ramirez* (2022) 13 Cal.5th 997, 1147.) Here, none of these characteristics were present: Rivera was not a law enforcement officer; Perez's statements to Rivera did not involve any degree of formality; and there was no other indication that the statements were intended to create evidence for Jasso's prosecution. Therefore, admitting Perez's out-of-court statements did not deprive Jasso of his Sixth Amendment right to confront Perez.

While Jasso also cursorily asserts that the admission of Perez's statements violated other federal constitutional rights, we have repeatedly explained that ordinary application of state evidence law generally raises no constitutional issue. (See, e.g., *People v. Cowan* (2010) 50 Cal.4th 401, 463–464 [rejecting due process claim on the ground that testimony about hearsay statements was properly admitted under state law].)

In sum, Jasso has not identified any reversible error in the admission of the first layer of hearsay, consisting of Perez's statements to Rivera.

### c. *Admission of Manuel Rivera's Statements*

This brings us to the second layer of hearsay. As noted above, when defense counsel initially litigated the admissibility of Perez's statements to Rivera, the parties anticipated that the statements would come in through Rivera's testimony. But at an evidentiary hearing several weeks later, it became clear that Rivera would not answer questions. The parties then discussed

alternatives to Rivera's testimony and agreed that at trial, Detective Carrillo would testify about Rivera's account of his conversations with Perez. Several days after this discussion, the prosecution called Detective Carrillo to testify. Defense counsel did not object to questions eliciting Perez's statements, as they had been told to Rivera.

Although Jasso's trial counsel had agreed to the admission of Rivera's statements to Detective Carrillo, Jasso now contends that the admission of Rivera's statement to police violated both the rule against hearsay and his Sixth Amendment right to confront his accusers. We conclude that Jasso has not preserved the objection.

### i. Forfeiture

At the outset, while Jasso concedes that his attorney agreed to the admission of Rivera's statements through Detective Carrillo's testimony, he argues that trial counsel's earlier objection to the admission of Perez's statements to Rivera was sufficient to preserve his objection to the admission of the statements through Detective Carrillo. We disagree. Although trial counsel had initially objected to the introduction of Perez's statements on both state law and federal constitutional grounds, on October 6, 2009, the trial court overruled his objections to the admission of Perez's statements through Rivera. Then, after the November 9, 2009, evidentiary hearing, counsel agreed to allow Detective Carrillo to relay Rivera's out-of-court statements, and did not object to his testimony when it was presented on November 16, 2009. In other words, trial counsel had objected to the first layer of hearsay at issue here, but explicitly agreed to admission of the second layer. One issue does not subsume the other: Whether

Perez's statements to Rivera were admissible as declarations against interest, and whether Rivera's report of those statements could be introduced through Detective Carrillo's testimony, are two entirely different questions. The grounds for admitting or excluding Rivera's statements are not the same as those for Perez's statements, and trial counsel did not argue at any point to the trial court that Rivera's out-of-court statements were inadmissible on any ground. Moreover, any arguments as to why Perez's statements should not be admitted would have been entirely irrelevant to the admissibility of Rivera's statements about shooting his gun in Duke's ranch and where used shell casings might be found, which did not report what Perez had said, and which Jasso also argues now should have been excluded.

"[N]umerous decisions by this court have established the general rule that trial counsel's failure to object to claimed evidentiary error on the same ground asserted on appeal results in a forfeiture of the issue on appeal." (*People v. Dykes* (2009) 46 Cal.4th 731, 756; accord, *People v. Redd* (2010) 48 Cal.4th 691, 729.) Here, Jasso's trial counsel did not merely fail to object to the admission of Rivera's statements; Jasso's counsel affirmatively agreed to allow the statements to come in through Detective Carrillo's testimony as "a way around" Rivera's refusal to testify. Even if, as the Attorney General concedes to be the case, no hearsay exception would allow the introduction of Rivera's statements, Jasso acquiesced to the admission of the statements through Detective Carrillo and so has failed to preserve the claim he now seeks to raise.

Jasso argues that Penal Code section 1259 empowers us to review this issue notwithstanding the lack of an objection during trial. The argument is unavailing. Section 1259

provides: "Upon an appeal taken by the defendant, the appellate court may, without exception having been taken in the trial court, review any question of law involved in any ruling, order, instruction, or thing whatsoever said or done at the trial or prior to or after judgment, which thing was said or done *after objection made in and considered by the lower court*, and which affected the substantial rights of the defendant. The appellate court may also review *any instruction* given, refused or modified, even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby." (Italics added.) We have explained that section 1259 cannot be invoked to raise for the first time on appeal a claim of erroneous admission of evidence when no objection was made in the trial court: "This section distinguishes claims of instructional error, which may be asserted even without objection if they affect the defendant's substantial rights, from other claims of error, which require a trial objection." (*People v. Seijas* (2005) 36 Cal.4th 291, 302.) The latter rule is reflected in Evidence Code section 353, which requires an objection to preserve a claim of error based on the admission of evidence. (*Seijas*, at p. 302.; see Evid. Code, § 353.)

### ii. Ineffective Assistance of Counsel

Jasso argues that if we conclude that his objection to the admission of Rivera's statements to Detective Carrillo has not been preserved, we should hold that the failure to preserve the claim is the product of constitutionally ineffective assistance of trial counsel. Jasso's ineffective assistance claim is not, however, appropriate for resolution on direct appeal.

"A criminal defendant's federal and state constitutional rights to counsel (U.S. Const., 6th Amend.; Cal. Const., art. I,

§ 15) include the right to *effective* legal assistance. When challenging a conviction on grounds of ineffective assistance, the defendant must demonstrate counsel's inadequacy. To satisfy this burden, the defendant must first show counsel's performance was deficient, in that it fell below an objective standard of reasonableness under prevailing professional norms. Second, the defendant must show resulting prejudice, i.e., a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different. When examining an ineffective assistance claim, a reviewing court defers to counsel's reasonable tactical decisions, and there is a presumption counsel acted within the wide range of reasonable professional assistance." (*People v. Mai* (2013) 57 Cal.4th 986, 1009 (*Mai*).)

We have noted in many cases that "except in those rare instances where there is no conceivable tactical purpose for counsel's actions, claims of ineffective assistance of counsel should be raised on habeas corpus, not on direct appeal," especially where "the alleged incompetence stems from counsel's failure to object." (*People v. Lopez* (2008) 42 Cal.4th 960, 972 (*Lopez*); see also *People v. Caro* (2019) 7 Cal.5th 463, 488 ["On direct appeal, if the record ' "sheds no light on why counsel acted or failed to act in the manner challenged," ' we must reject the claim ' "unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation" ' " (quoting *People v. Wilson* (1992) 3 Cal.4th 926, 936)].) Habeas proceedings are the appropriate avenue for evaluating claims of ineffective assistance of counsel because "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct,

and to evaluate the conduct from counsel's perspective at the time." (*Strickland v. Washington* (1984) 466 U.S. 668, 689 (*Strickland*).) "On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation." (*Mai, supra,* 57 Cal.4th at p. 1009; accord, *People v. Arredondo* (2019) 8 Cal.5th 694, 711; see *People v. Centeno* (2014) 60 Cal.4th 659, 676–677 [reversing for ineffective assistance of counsel on direct appeal where counsel inexplicably failed to object to a prosecutor's argument seriously misstating the prosecution's burden of proof].)

As both parties now agree, there was no hearsay exception that would permit Detective Carrillo to testify as to Rivera's out-of-court statements. But it is a different question whether defense counsel's agreement to admit the testimony through Detective Carrillo constituted ineffective assistance. This is not one of the "rare" cases in which we can resolve that issue on direct appeal, and without further factual development evaluate what, if any, tactical or strategic reasons counsel may have had for permitting Detective Carrillo to testify about what Rivera had told him. (*Lopez, supra,* 42 Cal.4th at p. 972.)

Before trial, Jasso's counsel unsuccessfully argued that Rivera should not be allowed to testify about what Perez had told him, citing case law interpreting hearsay rules and the Sixth Amendment confrontation clause. But then, weeks later, when it became apparent that Rivera would not testify about what Perez had said, Jasso's trial counsel formed an agreement with the prosecutor to allow Detective Carrillo to testify about what Rivera said during his interview, provided that a

stipulation of Rivera's past crimes that would allow him to impeach Rivera's credibility be read to the jury. The conversation between the prosecutor and Jasso's trial counsel that led to this agreement is not part of the record on appeal. During record settlement proceedings, neither Jasso's trial counsel nor the prosecutor could recall the content of that colloquy. Jasso's trial counsel also declined to address his tactical decisions and agreements with the prosecutor as not properly before the court during the record settlement hearing. When the prosecution called Detective Carrillo in the middle of its case, defense counsel made no effort to object to Detective Carrillo's testimony.

It is unclear why defense counsel would initially object to the admission of Perez's statements through Rivera's testimony, then later permit Detective Carrillo to transmit the same statements in Rivera's absence. It is possible, as the Attorney General acknowledges, that counsel may simply have missed the fact that permitting Carrillo to testify about Rivera's statements would create its own hearsay problems. But it is also possible that counsel's decision was a tactical one.[4] The challenged statements were unquestionably damaging to Jasso,

---

[4] The record does reflect some confusion on the part of one member of Jasso's two-attorney team, who stated during the penalty phase that because Rivera's statements were "said to a civilian" and were "nontestimonial," they were admissible as prior inconsistent statements, even though Rivera refused to testify. This statement was both factually and legally inaccurate. But this attorney was not the attorney who had litigated the introduction of Perez's statements before trial, and the record supplies no basis for inferring that the litigating attorney was similarly confused about the nature of Rivera's statements.

inasmuch as they confirmed that he shot Cardona in the course of a robbery. But the Circle K and video evidence had already placed Jasso — and Jasso alone — inside the minivan on the day and near the time of the murder, and other evidence connected Jasso to the weapon used in the murder.[5] Damaging though they were, Perez's statements were of at least some help to the defense insofar as they supplied clear evidence that Jasso had not, in fact, been alone at the scene of the murder. This evidence formed the cornerstone of the third party culpability defense that Jasso raised in closing argument. To make out the defense that it was Perez, not Jasso, who had shot Cardona, counsel leaned heavily on Perez's statements that he was at the scene and participated in the robbery, while emphasizing the weakness and unreliability of Perez's and Rivera's accounts insofar as those accounts had placed the lion's share of the blame on Jasso.

The record does not reveal whether a desire to lay the foundation for this defense — or, indeed, any other strategic consideration — was what actually prompted counsel to agree to let Detective Carrillo testify, notwithstanding the risks the testimony posed. As such, we have "no basis on which to determine whether counsel had a legitimate reason for making a particular decision, or whether counsel's actions or failure to take certain actions were objectively unreasonable." (*People v. Mickel* (2016) 2 Cal.5th 181, 198 (*Mickel*).) This is not the unusual case in which we can conclude, based on the silent

---

[5] As Jasso's counsel pointed out at oral argument, evidence from the Circle K video may be consistent with a third party theory of culpability, insofar as some video footage is suggestive of the presence of a third party on the evening of the crime. But the video evidence placed only Jasso inside the minivan.

record, that trial counsel had no conceivable reason to proceed in this fashion. Whether counsel balanced the costs and benefits of allowing the admission of Perez's statements to Rivera, and whether any such balancing was within the realm of professional competence, are questions to be explored on habeas review. There, a more complete record can be made to either support or refute the usual presumption that counsel's decisions reflect reasonable professional judgment. (See *Mai*, *supra*, 57 Cal.4th at p. 1009; see also, e.g., *People v. Dunkle* (2005) 36 Cal.4th 861, 932 ["Resolution of any claim predicated on *Strickland* must await collateral proceedings."].) Should the habeas court conclude that counsel's performance was deficient, it must then evaluate whether the admission of Perez's statements prejudiced Jasso as to guilt, as to the robbery-murder special-circumstance allegation, or as to penalty.

2. *Admission of Benjamin Pinela's Hearsay Statement About the Firearm*

Jasso argues that the trial court erroneously allowed introduction of inadmissible hearsay statements by Benjamin Pinela through Jack Duke's testimony and that the error was prejudicial. We find no reversible error.

After Duke stated that he had asked Pinela what he had done with the firearm that Manuel Rivera had given him, the prosecutor asked Duke what Pinela said in response. Jasso's counsel objected on hearsay grounds, but the trial court overruled the objection without explanation. Duke went on to respond: "He said that he gave it to Chris [Jasso] and got it dirty. He didn't want it. They threw it away." The Attorney General argues that the trial court properly overruled the objection because Pinela's statement was admissible as a declaration against his penal interest.

The Attorney General's argument that Pinela's statement was a declaration against interest is weak. Certainly, it is reasonable to interpret Pinela's statement that Jasso "got [the gun] dirty" to show Pinela understood the gun had been used illegally. But the Attorney General fails to articulate persuasively how this awareness would amount to legally relevant involvement in a robbery and murder. That Pinela knew the gun had been used illegally after the fact does not show that he knew it would be so used before he handed it over; nothing in Pinela's statement indicates that he knew Jasso's intended use of the gun when he gave it to him — that is, that he knowingly aided and abetted a robbery.

Even assuming that Pinela's statement was erroneously admitted, we conclude that the error was harmless. Contrary to Jasso's contention, "the erroneous admission of hearsay evidence alone does not establish a violation of the confrontation clause of the Sixth Amendment" or "other federal constitutional rights." (*People v. Page* (2008) 44 Cal.4th 1, 48.) Pinela's statement to Duke, his stepfather, was not testimonial and therefore did not implicate Jasso's Sixth Amendment right to confront the witnesses against him. Given that, "generally, violations of state evidentiary rules do not rise to the level of federal constitutional error" (*People v. Benavides* (2005) 35 Cal.4th 69, 91), we treat the erroneous admission of hearsay evidence as "state law error . . . subject to the traditional *Watson* test: The reviewing court must ask whether it is reasonably probable the verdict would have been more favorable to the defendant absent the error" (*People v. Partida* (2005) 37 Cal.4th 428, 439).

Jasso has not demonstrated that it is reasonably probable that he would have obtained a more favorable result if Pinela's

response to Duke had not been introduced. Pinela's response indicated that he had handed Rivera's firearm to Jasso. But Duke himself testified, in essence, that he had witnessed this transaction occur. Specifically, Duke testified that he saw Pinela hand Jasso "something silvery," a "silver-colored whatever" in the late afternoon or evening of September 6, 2003 — hours before Cardona was shot. Duke testified that he had seen Pinela give Jasso the object from about 100 feet away and did not know what it was. But on redirect examination, after being shown a copy of a transcript of his interview with police, Duke acknowledged telling police that the object in question was a gun. Duke further acknowledged telling police that he had confronted Pinela a few days later and asked about the gun he had gotten from Rivera and given to Jasso. Duke testified that he told investigators that he had learned from Rivera that the gun was a .25 caliber, and that he believed it was a .25-caliber handgun. Although Duke was ultimately unwilling to state definitively on the stand that he had seen Pinela hand Jasso a gun the evening before the shooting, he admitted that he was "pretty sure" at the time that he had seen Pinela give Rivera's gun to Jasso.

Given Duke's other testimony and prior statements to police about witnessing Pinela give the gun to Jasso, there was no reasonable probability that the outcome of trial would have been different had he been prevented from testifying about Pinela's statement about giving the gun to Jasso. As for Pinela's further references to the gun getting "dirty" and that "[t]hey threw it away," neither of these vague references clearly referred to Jasso or his actions. It is thus unlikely either statement affected the jury's consideration of Jasso's culpability, given the other evidence much more directly implicating Jasso

40

in the murder of Cardona. We conclude that it was not reasonably probable that the jury would have reached a verdict more favorable to Jasso but for Duke's testifying about what Pinela told him had happened with Rivera's gun.

### 3. *Prosecution's Leading Questions to Pinela*

Jasso next contends that the prosecutor violated Jasso's Sixth Amendment right to confrontation by posing a series of leading questions that Pinela refused to answer. Jasso concedes that his trial counsel failed to object to this questioning but argues that trial counsel was ineffective for failing to object. We reject this claim.

### a. *Background*

The prosecution granted Benjamin Pinela use immunity so that he would testify about giving Jasso a firearm. The prosecutor told the court during an evidentiary hearing that Pinela would testify consistent with other evidence that he gave Jasso Rivera's gun and that Jasso had threatened him. After the prosecutor explained to Pinela that anything he said could not be used against him, Pinela said he understood. Nevertheless, Pinela refused to answer the prosecutor's questions during the evidentiary hearing and the court held him in contempt. The prosecutor then stated that he intended to ask Pinela about receiving the firearm from Rivera and handing it over to Jasso, and that Duke's testimony would also establish that Pinela got the weapon from Rivera and gave it to Jasso.

Pinela then took the stand in the jury's presence. Again, he refused to answer any questions, and the court found him in contempt. After the prosecutor requested and received permission to treat Pinela as a hostile witness, he and Pinela had the following exchange:

"[Prosecutor].  Isn't it true, Mr. Pinela, that you have a sister by the name of Delores Torres?

"[Pinela].  I respectfully refuse to answer any questions.

"[Prosecutor].  Isn't it also true that Delores Torres is a significant other of Christopher Jasso?

"[Pinela].  Like I said, I respectfully refuse to answer any questions.  [¶] . . . [¶] . . .

"[Prosecutor].  You have a friend by the name of Manuel Rivera, don't you?

"[Pinela].  I respectfully refuse to answer any questions.

"[Prosecutor].  Isn't it true that Manuel Rivera gave you his chrome .25 caliber handgun when he left for Arizona?

"[Pinela].  I respectfully refuse to answer any questions.

"[Prosecutor].  Isn't it also true that on September 6th, 2003 you gave that same chrome handgun to Christopher Jasso?

"[Pinela].  I refuse to answer any questions.

"[Prosecutor].  Isn't it true, Mr. Pinela, that you have been threatened by Mr. Jasso in the past and the reason you're refusing to answer questions is out of fear of retaliation?

"[Pinela].  I refuse to answer any questions."

Pinela also refused to answer questions from defense counsel.

### b.  Discussion

Although Jasso argues that the prosecutor's leading questions to Pinela violated his Sixth Amendment right to confrontation, he does not dispute that his trial counsel interposed no objection to the prosecutor's questioning of Pinela. "Because there was no objection to these [leading questions],

this claim is forfeited." (*People v. Dykes*, *supra*, 46 Cal.4th at p. 773.) Jasso argues that the forfeiture should be excused on ineffective assistance grounds, but fails to establish that his counsel rendered constitutionally ineffective assistance by failing to object to the leading questions.

California appellate courts have held that a defendant's right to confrontation is violated if a prosecutor facing a witness who refuses to answer essentially testifies for the witness by asking leading questions that convey prior statements incriminating the defendant that the witness made to police. (See, e.g., *People v. Murillo* (2014) 231 Cal.App.4th 448, 456 (*Murillo*) [prosecutor's leading questions precluded defense cross-examination "on what was tantamount to devastating adverse testimony," violating the defendant's right to confrontation]; *People v. Shipe* (1975) 49 Cal.App.3d 343, 349 (*Shipe*) [similar]; see also *Perez*, *supra*, 243 Cal.App.4th at p. 886 [stating in dicta that "California cases have repeatedly . . . conclude[d] that a defendant's right to confrontation is violated where, in examining a recalcitrant witness, the prosecutor poses leading questions that provide the details of prior statements the witness made to police regarding a defendant's commission of a crime"].) The high court has similarly held that a defendant's right to confrontation is violated when a prosecutor reads a recalcitrant witness's prior statement to police to the jury in lieu of actual questioning. (*Douglas v. Alabama* (1965) 380 U.S. 415, 416–417, 420 (*Douglas*).)

Likening the prosecutor's questioning of Pinela to the improper questioning in these cases, Jasso contends that trial counsel should have objected to the violation of his confrontation rights. Jasso argues that the prosecutor's leading questions

were prejudicial because they "created the indelible, improper, impression in the jury's mind that Pinela was given a gun by Rivera, and Pinela, in turn, gave it to [Jasso]," and because they improperly led the jury to believe that Pinela refused to testify because Jasso had threatened him.  We are unpersuaded.

The prosecutor's questioning of Pinela was meaningfully different from the questioning in the cases on which Jasso relies. This case is not comparable to *Douglas*, where the prosecutor "produced a document said to be a confession signed by" the witness who refused to testify.  This document supplied the only direct evidence that Douglas had wounded the victim, and so "formed a crucial link in the proof both of [Douglas's] act and of the requisite intent to murder." (*Douglas, supra*, 380 U.S. at p. 419.)  While pretending to cross-examine the witness, the prosecutor "purported to read from the document, pausing after every few sentences to ask [him], in the presence of the jury, 'Did you make that statement?'" (*Id*. at p. 416.)  There, the prosecutor claimed to be reading directly from a damaging confession to police officers; read the document in its entirety; and "called three law enforcement officers who identified the document as embodying a confession made and signed" by the witness. (*Id*. at p. 417; see *id*. at pp. 416–417.)  No similar circumstances were present in the prosecutor's questioning of Pinela.

Nor is this case comparable to the Court of Appeal cases that Jasso cites.  As in *Douglas*, the prosecutors in all of these cases did more than merely pose leading questions.  They read what they told the jury were the recalcitrant witness's statements to police officers, asking the witnesses if they had in fact made those statements to police. (*Perez, supra*, 243 Cal.App.4th at pp. 884–885 [prosecutor asked witness

"numerous questions about the statements he had made to police," showed him a transcript of the statements, and asked him whether it refreshed his recollection]; *Murillo, supra,* 231 Cal.App.4th at p. 456 [witness's "refusal to answer over 100 leading questions while the prosecutor read to the jury from his police interviews denied Murillo the opportunity to cross-examine the victim on what was tantamount to devastating adverse testimony"]; *Shipe, supra,* 49 Cal.App.3d at pp. 349–350 [leading questions created powerful inferences "that appellant was the one who viciously and brutally stabbed the decedent" and "that the witnesses had related the events about which they were being questioned to the authorities and that their statements were true"].)

Here, the prosecutor did not purport to be reading Pinela's confession to police. Pinela's statement was neither devastating to Jasso nor the only evidence indicating that Jasso had received the murder weapon the evening before Cardona was shot. The prosecution did not craft questions designed to give the illusion of direct testimony but instead focused on eliciting information within Pinela's personal knowledge. Without any indication that the jury was led to believe they were hearing Pinela's prior statements or that the statements were critical to the prosecution's case, we are unpersuaded that trial counsel rendered deficient performance by failing to object on confrontation grounds. (Cf. *People v. Hillhouse* (2002) 27 Cal.4th 469, 502 ["deciding whether to object is inherently tactical, and the failure to object will rarely establish ineffective assistance"].)

In any event, it is not reasonably probable that the prosecutor's leading questions to Pinela affected the outcome of trial. For one thing, aside from the suggestion that Jasso had

threatened Pinela, the prosecution's questions to Pinela provided no information that the jury did not learn later from Duke, who testified that he saw Pinela hand Jasso a silver object the evening before Cardona was murdered. Though Duke would not definitively state that the silver object was a firearm, he admitted that he was "pretty sure" at the time that Pinela had given Rivera's gun to Jasso.

Moreover, jurors were aware they were not to treat the prosecutor's questions or arguments as evidence. The jury was instructed with CALCRIM No. 222 as follows: "You must decide what the facts are in this case. You must use only the evidence that was presented in this courtroom. Evidence is the sworn testimony of witnesses, the exhibits admitted into evidence, and anything else I told you to consider as evidence. [¶] Nothing that the attorneys say is evidence. In their opening statements and closing arguments, the attorneys discuss the case, but their remarks are not evidence. *Their questions are not evidence.* Only the witnesses' answers are evidence. The attorneys' questions are significant only if they helped you to understand the witnesses' answers. *Do not assume that something is true just because one of the attorneys asked a question that suggested it was true.*" (Italics added.) "As we have consistently stated in numerous contexts we generally presume that jurors are capable of following, and do follow, the trial court's instructions." (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 447.) The nature of the prosecutor's limited questioning of Pinela supplies no reason to discard that presumption in this case.

4. *Sufficiency of the Evidence of the Robbery-Murder Special Circumstance*

Jasso asks us to reverse the robbery-murder special circumstance on the ground that there was no evidence that a robbery had been committed aside from Perez's statements. As noted, Jasso contends these statements should have been excluded, even though his counsel had agreed to their introduction. Even if we agreed with Jasso's premise, this argument would fail. As we reiterated recently, "[e]vidence erroneously admitted is properly considered in weighing the sufficiency of evidence to support a conviction, notwithstanding its erroneous admission." (*People v. Navarro* (2021) 12 Cal.5th 285, 311.) The reason for this is that "a reversal based solely on evidentiary insufficiency has fundamentally different implications, for double jeopardy purposes, than a reversal based on such ordinary 'trial errors' as the 'incorrect receipt or rejection of evidence.' [Citation.] While the former is in effect a finding 'that the government has failed to prove its case' against the defendant, the latter 'implies nothing with respect to the guilt or innocence of the defendant,' but is simply 'a determination that [he] has been convicted through a judicial *process* which is defective in some fundamental respect.' " (*Lockhart v. Nelson* (1988) 488 U.S. 33, 40.) Because Jasso does not argue that the evidence admitted at trial was insufficient to support the robbery finding, this claim fails.

5. *Evidence Corroborating Perez's Account*

Jasso also argues that the robbery-murder special circumstance must be reversed for lack of evidence corroborating Perez's statements. This argument lacks merit.

Under California law, a defendant cannot be convicted of a crime based on the testimony of an accomplice unless that testimony is corroborated by independent evidence that connects the defendant with the commission of the crime. (Pen. Code, § 1111.) We have recognized that this rule extends to special circumstances that require proof of a crime other than the charged murder. (See, e.g., *People v. Avila* (2006) 38 Cal.4th 491, 570 [stating that a special circumstance "crime cannot be proved by the uncorroborated testimony of an accomplice"].) "Corroborating evidence may be slight, entirely circumstantial, and entitled to little consideration when standing alone. [Citations.] It need not be sufficient to establish every element of the charged offense or to establish the precise facts to which the accomplice testified. [Citations.] It is 'sufficient if it tends to connect the defendant with the crime in such a way as to satisfy the jury that the accomplice is telling the truth.' " (*People v. Valdez* (2012) 55 Cal.4th 82, 147–148.) But importantly, " ' "when the out-of-court statements are not given under suspect circumstances, those statements do not qualify as 'testimony' and hence need not be corroborated under . . . section 1111." ' " (*People v. Hoyt* (2020) 8 Cal.5th 892, 946, quoting *People v. Williams* (1997) 16 Cal.4th 153, 245.) " ' "The most obvious suspect circumstances occur when the accomplice has been arrested or is questioned by the police." ' " (*Ibid.*)

Perez's statement — made over the phone to a close friend — did not involve any suspect circumstances that would bring Penal Code section 1111 into play. But even if section 1111 did apply to Perez's statements, the corroborating evidence here would suffice.

First, independent evidence placed Jasso in Cardona's minivan shortly before the first 911 call reporting the shooting.

Forensic investigators found fingerprints matching Jasso's on a newspaper dated September 6, 2003, in Cardona's minivan. Video from a Circle K store roughly a quarter mile from where Cardona was shot showed Jasso entering the store shortly after a yellow minivan pulled into the parking lot at around 12:13 a.m. on September 7, 2003, and the minivan leaving the parking lot after Jasso exited the store at 12:16 a.m. — a few minutes before the first 911 call reporting the shooting was placed at 12:20 a.m. Although Jasso contends on appeal that the videos were unclear and did not show him getting into the van, this was not contested at trial. In closing argument, trial counsel gave no hint of doubt that the Circle K videos showed Jasso, and that the later video showed him getting into Cardona's van: "Mr. Jasso's in that Circle K for, like, 15 minutes getting gas, getting sodas, spending his money. Goes back out, and we don't see anything until 12:15. At 12:15 you see Mr. Jasso go into a different Circle K and ask for a book of matches. At 12:15. [¶] If you're watching that video — and you will have it; we can play it for you again if you need it. But if you're watching that video, you see the van, when Mr. Jasso leaves Circle K, back up and then drive out. And when that van leaves your sight, it's 12:16 and five-hundredths of a second, I guess. 12:16." He did not try to argue that the fingerprints on the newspaper found in Cardona's van were not Jasso's, or that Jasso was not wearing the beige cargo shorts recovered from his trailer in the Circle K videos. The trial record belies Jasso's claims about the weakness of this evidence, which supported an inference that Jasso was in Cardona's taxicab shortly before the murder. This was independent evidence corroborating Perez's statements that Jasso was inside the taxicab at the time of the murder.

Second, testimony from Duke and Pelzel was sufficient to persuade reasonable jurors that Jasso was armed with the gun that was used to murder Cardona. As discussed above, Duke testified that he saw Pinela give Jasso a silver object earlier that evening and admitted that when he spoke with investigators he was "pretty sure" that the object was Rivera's .25-caliber gun. Pelzel testified that he compared the two .25-caliber shell casings recovered from the ranch where Jasso lived with the two .25-caliber casings from the crime scene. He testified that he found in all four casings "matching firing pin impressions, but — and also the fact that the firing pin punched through the primer." According to Pelzel, this was a malfunction that is "not very common" because it is "kind of a bad malfunction to have," but "there may be another firearm out there that could produce the same marks." When the prosecutor asked Pelzel whether he was saying that "[a]ll four [shell casings] had the same firing pin malfunction that . . . is unique and rare," Pelzel answered, "That's correct." Based on this testimony, a jury could conclude that Jasso was not only inside the taxicab when Cardona was shot but was in fact the shooter. This testimony corroborated Perez's statement that Jasso shot Cardona.

Third, the jury was presented with evidence that allowed it to draw a reasonable inference that Cardona's wallet and cash had been taken from him when he was murdered. Cardona's coworkers testified that taxi drivers were required to carry a driver's license and usually carried between $20 and $70 in cash to make change. This evidence supported an inference that *someone* had robbed Cardona, and additional evidence supported the inference that Jasso was that person. Jasso's argument — that the evidence established that he could not have taken Cardona's wallet because police had recovered

Cardona's brown wallet and returned it to his mother, and the black wallet that Jasso had his sister Jennifer pick up from the police station when he was arrested was a wallet that their brother Gabriel had given him — fails because it both misinterprets the evidence and casts it in the light most favorable to him, rather than the People.

It is true, as Jasso emphasizes, that one of Cardona's coworkers testified that he recalled Cardona having a brown wallet, and Cardona's mother approached the prosecutor near the end of the trial and told him that she had a brown wallet that used to belong to her son. Cardona's mother did not recall where she got that wallet, but she believed a detective had given it to her. Nevertheless, those facts do not establish, as Jasso contends, that Jasso cannot have taken Cardona's wallet because Cardona's mother had the wallet her son was carrying the night he was murdered. As the Attorney General notes, that Cardona's mother came forward with a wallet that contained a DMV-issued identification card but not a driver's license tends to support an inference that Cardona was *not* carrying this wallet during his shift when he was murdered. Jasso offers no plausible explanation for why detectives found no cash or a wallet at the crime scene or why the brown wallet Cardona's mother had contained no driver's license. We therefore disagree that the evidence showed that Cardona's cash or wallet were not taken from him when he was murdered.

Moreover, a reasonable jury could have concluded that Cardona was the owner of the black wallet that Jasso had with him when he was arrested. A Riverside County Sheriff's deputy, Sergeant Jeronimo Contreras, testified that after he was arrested, Jasso "had personal items such as a wallet [that] he wanted me to give . . . to his sister or the wife. . . . [¶] . . . [¶] . . .

51

[H]e had a wallet, and he asked that I give it to his family member which I want to think is a sister or his girlfriend, and which I did. I allowed him to hand it over to that person." Jasso's sister Jennifer testified that she picked up the wallet from the Indio jail on September 10, 2003, and gave it to Jasso's girlfriend, Delores. Jennifer testified at trial that her brother Gabriel had given Jasso the wallet. But when the prosecutor asked Jennifer about her previous statements about the wallet to investigators on September 12, 2003, she could not remember what she had told them. Though the prosecutor showed her a transcript of the interview to refresh her recollection, Jennifer still could not remember what she had told police about her brother's wallet after she read the transcript. The next day, Lieutenant William Hall took the stand and testified that Jennifer had told him on September 12, 2003, that she had never seen the wallet before. Given Jennifer's conflicting statements about the black wallet, the jury could have reasonably chosen not to credit her claim that the black wallet was a gift from her brother Gabriel. "[T]he jury was free to evaluate [Jennifer's] testimony and to deem it credible or not." (*People v. Thomas* (2023) 14 Cal.5th 327, 379.) Disbelieving Jennifer's testimony, the jury could infer that when Jasso was arrested he wanted to get rid of the wallet that he was carrying, and that his sister had changed her story about the wallet to help her brother avoid punishment. The evidence that no cash or a wallet had been found on Cardona or inside his cab and that Jasso took steps to get rid of the wallet he was carrying when he was arrested, combined with the evidence that Jasso had shot Cardona, corroborated Perez's statement that Jasso shot Cardona while he and Perez were robbing him.

6.  *Effect of Ameliorative Changes to the Felony-Murder Rule*

Jasso argues the jury was instructed on a theory of felony murder that is invalid under current law, and that this instructional error warrants reversal.  The Attorney General does not dispute that the felony-murder instructions that the jury received here are erroneous under current law.  He contends, however, that any instructional error here was harmless beyond a reasonable doubt because the record establishes conclusively that the jury did not rely on a now-invalid theory of felony murder.  We agree with the Attorney General.

a.  *Senate Bill 1347*

" 'Under the felony-murder doctrine as it existed at the time of [Jasso's] trial, "when the defendant or an accomplice kill[ed] someone during the commission, or attempted commission, of an inherently dangerous felony," the defendant could be found guilty of the crime of murder, without any showing of "an intent to kill, or even implied malice, but merely an intent to commit the underlying felony." [Citation.] Murders occurring during certain violent or serious felonies were of the first degree, while all others were of the second degree.' " (*People v. Wilson* (2023) 14 Cal.5th 839, 868 (*Wilson*).)

Senate Bill 1437, which became effective on January 1, 2019, "significantly changed the scope of murder liability for defendants who did not actually kill or intend to kill anyone, including those prosecuted on a felony-murder theory" to achieve more equitable sentencing and better align punishment with offenders' culpability. (*Wilson, supra*, 14 Cal.5th at p. 868.) "[T]he amended murder statute now limits felony-murder

liability to: (1) 'actual killer[s]' ([Pen. Code,] § 189, subd. (e)(1)); (2) those who, 'with the intent to kill,' aided or abetted 'the actual killer in the commission of murder in the first degree' (*id.*, subd. (e)(2)); and (3) 'major participant[s] in the underlying felony' who 'acted with reckless indifference to human life' (*id.*, subd. (e)(3))." (*Wilson*, at pp. 868–869.)

"Senate Bill 1437 also created a procedural mechanism for those convicted of murder under prior law to seek retroactive relief," now codified in Penal Code section 1172.6. (*Wilson*, *supra*, 14 Cal.5th at p. 869.) After we held that this resentencing procedure is "the exclusive mechanism for retroactive relief and thus the ameliorative provisions of Senate Bill 1437 do not apply to nonfinal judgments on direct appeal" (*People v. Gentile* (2020) 10 Cal.5th 830, 839), "[t]he Legislature abrogated this holding the following year . . . by expressly authorizing challenges on appeal" (*Wilson*, at p. 869). "A newly added subdivision states: 'A person convicted of murder, attempted murder, or manslaughter whose conviction is not final may challenge on direct appeal the validity of that conviction based on the changes made to [the felony-murder rule] by Senate Bill 1437.' ([Pen. Code,] § 1172.6, subd. (g); see Stats. 2021, ch. 551, § 1.)" (*Wilson*, at p. 869.)

Jasso was convicted of first degree murder in December 2009. The trial court instructed the jury on two theories of first degree murder: (1) willful, deliberate, and premeditated murder, and (2) murder during the commission of a robbery or attempted robbery — i.e., felony murder. The Attorney General does not dispute that, though the felony-murder instructions were proper when Jasso was tried, the jury was not instructed on the additional elements now required to establish felony-murder liability — that the defendant was the

actual killer; an accomplice who acted with intent to kill; or an accomplice who was a major participant in the underlying felony who acted with reckless indifference to human life.

### b. *Alternative-theory Error*

"When a court instructs on two theories of an offense, only one of which is legally valid, the problem is known as 'alternative-theory error.'" (*Wilson, supra*, 14 Cal.5th at p. 871, quoting *People v. Aledamat* (2019) 8 Cal.5th 1, 9 (*Aledamat*).) Here, as in *Wilson*, there is no dispute that the felony murder theory can no longer be relied on "because it is possible that the jury based its verdict on felony murder as it was previously defined" and "could conceivably have concluded that [Jasso] intended to [rob Cardona] but not that he intended to kill him." (*Wilson*, at p. 871.) Therefore, "Senate Bill 1437 created the possibility of alternative-theory error in this case retroactively." (*Ibid.*)

The standard of prejudice applicable to alternative-theory error is the same beyond a reasonable doubt standard that generally applies to misdescriptions of the elements of an offense. (*Wilson, supra*, 14 Cal.5th at p. 872.) "Under this standard, a conviction must be reversed unless a reviewing court, 'after examining the entire cause, including the evidence, and considering all relevant circumstances, . . . determines the error was harmless beyond a reasonable doubt.'" (*Ibid.*, quoting *Aledamat, supra*, 8 Cal.5th at p. 13.)

" '[A] reviewing court may hold the error harmless where it would be impossible, based on the evidence, for a jury to make the findings reflected in its verdict without also making the findings that would support a valid theory of liability. [Citation.]' [Citation.] Furthermore, 'while "overwhelming"

55

evidence may demonstrate harmlessness, a court's analysis of whether the evidence is "overwhelming" in this context is not as subjective or free-ranging as that term might imply.' [Citation.] Instead, the reviewing court has an obligation 'to rigorously review the evidence to determine whether any rational juror who found the defendant guilty based on an invalid theory, and made the factual findings reflected in the jury's verdict, would necessarily have found the defendant guilty based on a valid theory as well.' " (*Wilson, supra*, 14 Cal.5th at p. 873.)

### c. Discussion

The question here is whether a reasonable jury that made the findings that the jury made in Jasso's trial could have made those findings without also concluding that Jasso was guilty of first degree murder under a currently valid theory of murder. (See *Wilson, supra*, 14 Cal.5th at p. 873.) The Attorney General contends that, given the evidence at trial, the jury could not have found true either the robbery-murder special circumstance or the firearm-use enhancements without also concluding that Jasso was the actual killer, which would make him ineligible for relief under Senate Bill 1437. We agree.

For the enhancement based on personal use of a firearm (Pen. Code, § 12022.5, subd. (a)), the jury was instructed: "If you find the defendant guilty of the crime charged in Count 1, first-degree murder or second-degree murder, you must then decide whether the People have proved the additional allegation that the defendant personally used a firearm during the commission of that crime. . . . [¶] A firearm does not need to be in working order if it was designed to shoot and appears capable of shooting. A firearm does not need to be loaded. [¶] Someone personally uses a firearm if he or she does any of the following:   One,

displays the weapon in a menacing manner; two, hits someone with the weapon; or, three, fires the weapon."

For the enhancement based on the discharge of a firearm (Pen. Code, § 12022.53, subd. (d)), the jury was instructed: "If you find the defendant guilty of the crime charged in Count 1, first-degree or second-degree murder, you must then decide whether the People have proved the additional allegation that the defendant personally and intentionally discharged a firearm during the commission of that crime causing great bodily injury or death. [¶] To prove this allegation, the People must prove that: One, the defendant personally discharged a firearm during the commission of that crime; two, the defendant intended to discharge the firearm; and, three, the defendant's act caused great bodily injury to, or the death of, a person."

Having been so instructed, the jury returned true findings that Jasso: (1) "did personally use a firearm, to wit a .25 caliber handgun"; (2) "did personally and intentionally discharge a firearm and proximately caused great bodily injury or death to another person, not an accomplice"; and (3) "did murder Carlos Cardona while engaged in the commission of, attempted commission of, and the immediate flight after committing and attempting to commit the crime of robbery."

Considering the evidence presented to it, the jury could not have made those findings about Jasso's firearm use without also concluding that Jasso was the actual killer. Cardona died from two gunshots to the head. Pelzel, the criminalist who analyzed the used shell casings found at the crime scene, concluded that the two bullets that killed Cardona were probably fired from the same .25-caliber firearm after finding unusual matching firing pin impressions and matching chamber

57

marks on the casings. No evidence suggested that Cardona had been otherwise harmed or threatened with a firearm before he was murdered. Nor was there any evidence that more than one firearm had been used in the murder, or that more than one shooter had fired at Cardona.

Even if a "finding of personal use . . . would not in itself prove defendant was the actual killer" in cases involving multiple armed participants in the underlying felony (*People v. Jones* (2003) 30 Cal.4th 1084, 1120; see *People v. Bland* (2002) 28 Cal.4th 313, 318, 337–338), this is not such a case. Here, the findings of personal use and intentional injury-or-death-causing discharge of a firearm necessarily imply a finding that Jasso was the actual killer because there was no evidence that the robbery involved more than one armed participant or that Cardona suffered any firearm-related injuries other than those inflicted by the fatal shots. For these reasons, we conclude that the failure to instruct the jury on felony murder in accordance with the terms of later-enacted Senate Bill 1437 was harmless beyond a reasonable doubt.

### 7. *"Equally Guilty" Instruction*

Jasso argues that the jury was erroneously instructed on accomplice liability. The court instructed the jury with CALCRIM No. 400 as follows: "A person may be guilty of a crime in two ways: One, he or she may have directly committed the crime. I will call that person the perpetrator; two, he or she may have aided and abetted a perpetrator, who directly committed the crime. A person is equally guilty of the crime, whether he or she committed it personally or aided and abetted the perpetrator who committed it. [¶] Under some specific circumstances, if the evidence establishes aiding and abetting of

one crime, a person may also be found guilty of other crimes that occurred during the commission of the first crime." According to Jasso, this instruction allowed the jury to convict him of first degree murder on an invalid theory of murder by imputing malice to him based only on his participation in a robbery. He claims that this instruction created the possibility that the jury found him guilty based on a natural-and-probable-consequences theory of murder that is invalid under current Penal Code section 188, subdivision (a)(3), which provides in part that "[m]alice shall not be imputed to a person based solely on his or her participation in a crime."[6]

In response, the Attorney General argues that: (1) this claim is forfeited because trial counsel did not object to the erroneous CALCRIM No. 400 instruction; (2) the jury did not receive a complete natural-and-probable-consequences instruction, so there is no reasonable likelihood that they were misled by the " 'equally guilty' " language in the instruction to impute malice to Jasso based only on his participation in the robbery; and (3) the jury's verdicts establish that the jury necessarily found that Jasso was the actual killer in any event. We conclude that the Attorney General has the better of this argument.

---

[6] This provision eliminating liability for murder as an aider and abettor under the natural-and-probable-consequences doctrine was enacted as part of Senate Bill 1437, discussed above. Like Senate Bill 1437's new definition of felony murder, Penal Code section 188, subdivision (a)(3) became effective January 1, 2019.

Even if trial counsel should have objected to the CALCRIM No. 400 instruction,[7] Penal Code "section 1259 allows us to reach the merits of any claim of instructional error that potentially affects a party's substantial rights." (*People v. Amezcua and Flores* (2019) 6 Cal.5th 886, 916.)  Reaching the merits, we reject Jasso's claim.  Here, as in *People v. Johnson* (2016) 62 Cal.4th 600, the jury was also instructed with CALCRIM No. 401, which informed the jury that it could only find Jasso liable as an aider and abettor to murder if it found that he knew the actual perpetrator intended to murder, that Jasso shared the murderous intent, and that Jasso had in fact aided the perpetrator in the murder.  That instruction "would have cleared up any ambiguity arguably presented by CALCRIM former No. 400's reference to principals being 'equally guilty.' " (*Johnson*, at p. 641.)  Moreover, it would have been impossible for the jury to return the verdicts that it did without concluding that Jasso was the actual killer or, at the very least, a major participant in a robbery who acted with reckless indifference to human life.  No rational jury could have concluded that Jasso personally and intentionally caused Cardona's injuries — two gunshots to the head — without an intent to kill.  The jury therefore could not have imputed malice to Jasso "based *solely* on his . . . participation in" the robbery. (Pen. Code, § 188, subd. (a)(3), italics added.)  Because the jury's verdicts conclusively establish that it did not find Jasso guilty of

---

**7** Before Jasso's trial, at least one Court of Appeal had concluded that CALCRIM No. 400 is misleading in murder cases because an aider and abettor must share the actual perpetrator's murderous intent to be equally guilty of murder. (See *People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1164–1165.)

murder solely because Jasso was involved in a robbery, this claim fails.

### 8.  *Lack of Fair or Adversarial Trial Process*

Jasso's final argument pertaining to error in the guilt phase of the trial posits that the trial court failed in its affirmative duty to ensure that he had a fair trial.  Relying primarily on *United States v. Cronic* (1984) 466 U.S. 648 (*Cronic*), Jasso contends that trial counsel's asserted failures were so severe that they amounted to a total breakdown of the adversarial process requiring the trial court to intervene to preserve the fairness of the trial.  The argument lacks merit.

"Under *Cronic*, if defense counsel 'entirely fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable,' and the conviction must be reversed without further prejudice analysis." (*People v. Banks* (2014) 59 Cal.4th 1113, 1169, quoting *Cronic*, *supra*, 466 U.S. at p. 659.)  " '[W]hen the defendant is represented by counsel, the [*Cronic*] presumption of prejudice will only stand when counsel entirely failed to subject the prosecution's case to meaningful adversarial testing. [Citations.]'  [Citation.]  Otherwise, 'specific errors and omissions' by trial counsel must generally be litigated as ineffective assistance of counsel claims under *Strickland.* (*Cronic*, at p. 657, fn. 20.)" (*Banks*, at p. 1170.)  "The United States Supreme Court later clarified: 'When we spoke in *Cronic* of the possibility of presuming prejudice based on an attorney's failure to test the prosecutor's case, we indicated that the attorney's failure must be complete.' (*Bell v. Cone* (2002) 535

U.S. 685, 696–697 [152 L.Ed.2d 914, 122 S.Ct. 1843].)" (*People v. Brown* (2014) 59 Cal.4th 86, 115.)

Here, Jasso asserts that his trial counsel made certain significant mistakes during the guilt phase of his trial. As we have noted, Jasso is entitled to pursue his claims for ineffective assistance of counsel under *Strickland*. But Jasso does not, and cannot, argue that trial counsel completely failed to test the prosecutor's case. His claim based on *Cronic* fails. (See, e.g., *In re Gay* (1998) 19 Cal.4th 771, 826.)

## B. Penalty Phase Issues

### 1. *Stipulations Regarding Other Violent Acts*

Jasso contends that trial counsel rendered ineffective assistance during the penalty phase by entering into stipulations regarding Jasso's assaults of Arturo Lopez, Jr., and Martin Mota. He claims that no strategic reason can explain these stipulations, which amounted to "unadorned confessions to incidents that wer[e] not only violent, but unjustified," describing the attacks as his "two most serious offenses . . . other than the instant crime." We reject his arguments as inappropriate to resolve on direct appeal.

### a. *Background*

In the penalty phase, the prosecution introduced evidence under Penal Code section 190.3, factor (b) of several other incidents in which Jasso committed acts of violence. With one exception, these incidents took place in jail after Jasso was arrested for the murder. The prosecution relied on the testimony of deputies who responded to the jail incidents to prove the occurrence of three of the four incidents it asked the jury to consider in aggravation. But there was no testimony to prove the incident that took place before the murder and one of

the four jail incidents; instead, the parties entered into stipulations describing those incidents and establishing that Jasso's victims had been convicted of crimes involving moral turpitude.

The Lopez stipulation stated that Lopez was walking down the street when "Jasso started walking with him" and "pulled out a knife and stabbed him in the arm and back." Lopez "did not know why Jasso stabbed him. They did not argue, and he did not have a problem with Jasso. Lopez stated he did not want prosecution against Jasso" and "d[id] not want to testify against . . . Jasso because they are cousins."

The Mota stipulation stated that a Riverside County Sheriff's deputy saw "Jasso choking inmate Martin Mota," who is "unable to walk unassisted." According to the deputy, "Jasso had his arms around Mota's neck from behind. Jasso was commanded to stop and he complied." The stipulation stated that "Jasso reported that he saw Mota on the floor of their cell having trouble, so he helped him up." The stipulation also provided Mota's account of the incident: that Jasso "walked over to him, and . . . struck him three times on the side of the face," "attempted to choke Mota from behind," and "threw him down to the ground and stomped on his lower back with his left foot." The parties also stipulated that Mota had been convicted of second degree murder for "an assault on a child under eight resulting in death" and petty theft.

The prosecution offered evidence of three other jail incidents that took place after Jasso assaulted Mota through the testimony of the deputies who responded to the incidents. Two deputies testified about Jasso's involvement in a fight with inmate Fred Garcia and another inmate that occurred on June

6, 2008. Another deputy testified about how Jasso was involved in a different three-way fight on January 16, 2009. Last, two deputies testified about Jasso's assault of inmate Jesse Diaz on January 26, 2009. One of the deputies also recounted searching Jasso's cell in February 2009 and finding a shank and altered razors there.

The defense response to the evidence of Jasso's other violent criminal acts can be broken down into two parts. The first was to establish that none of the men whom Jasso had harmed were innocent but were each violent or predatory criminals in their own right. The evidence in support of this were stipulations describing the criminal histories of four of the men Jasso had attacked (the fifth was an unnamed inmate).

The other part of the defense response was to contextualize the violent jail incidents through Dr. Franks's testimony, who explained what motivated Jasso to harm Garcia, Mota, and Diaz. Dr. Franks said that Jasso wanted to avoid trouble in jail and requested to be placed in protective custody to avoid violent encounters. Regarding Garcia, Dr. Franks stated Jasso acted in self-defense. Dr. Franks also said Jasso attacked Mota because Mota was essentially bragging to Jasso that he had murdered his daughter by showing him evidence from the case against him. Jasso called Mota a "child murderer" and was moved to attack him due to his protective attitude toward children generally, according to Dr. Franks. Similarly, Dr. Franks explained that Jasso attacked Diaz out of an impulse to be protective of his own stepdaughter, whom Diaz had molested.

In closing argument, defense counsel tied Jasso's attacks on Mota and Diaz to Jasso's devotion to his children and his

64

desire to be a protector. Counsel suggested "many righteous, law-abiding men would do the same to Jesse Diaz" and, though "wrong" and "misguided," the assault was "not a reason for death." He also suggested that the fact that Jasso had been involved in only four violent incidents in the six years he had spent in jail after the murder showed that he was assimilating to the prison environment and that his antisocial, violent tendencies were waning.

### b. Discussion

For Jasso to prevail on this claim of ineffective assistance of counsel, he must demonstrate that: (1) there was no conceivable rational tactical purpose for trial counsel to stipulate to the Lopez and Mota incidents, such that the stipulations constituted constitutionally deficient performance; and (2) that the deficient performance was prejudicial, meaning that there is a reasonable probability that, but for the stipulations, the jury would not have chosen death. (See, e.g., *Strickland*, *supra*, 466 U.S. at p. 695 [prejudice at the penalty phase is established when there is a reasonable probability that, but for counsel's deficient performance, the jury's weighing of aggravating and mitigating circumstances would not have led it to choose death].) As we have already explained (see pp. 34–35, *ante*), in general, because the appellate record usually does not reveal information sufficient to evaluate counsel's performance, claims of ineffective assistance of counsel are not appropriate for resolution on direct appeal. They are, in general, more appropriately considered in a habeas proceeding, where the parties can assemble a relevant record. (See *People v. Scott* (1997) 15 Cal.4th 1188, 1212; *Mickel*, *supra*, 2 Cal.5th at p. 198.)

The record on appeal does not reveal why counsel stipulated to Jasso's assault on Lopez. Jasso claims that because Lopez refused to testify, the jury would never have heard about the incident without the stipulation. But it is not clear from the record that Lopez refused to testify. Before the parties entered into the stipulation, the prosecutor explained that while Lopez had been subpoenaed, "he may have been told he'd have to come [to trial], [or] he may not have been told that." The prosecutor then asked the court to "issu[e] and hold[] a warrant on Mr. Lopez . . . so [he could] have an opportunity to try and contact him and address certain issues regarding the stipulation." The trial court agreed to issue the warrant, set the bail at $5,000, and hold it for two days. Without any further discussion on the record, the parties ultimately entered into the stipulation.

Though the stipulation states that "Mr. Lopez does not want to testify against Christopher Jasso because they are cousins," it remains possible that Lopez would have decided to appear and testify rather than be arrested had the parties not stipulated to the assault. If the possibility of Lopez offering live testimony about the incident remained live until the parties agreed to the stipulation, counsel could have reasonably concluded that the stipulation would likely be less damaging to Jasso than the victim's live testimony. While such speculation is not an appropriate basis to decide Jasso's ineffectiveness claim on appeal, we cannot rule out the possibility that counsel had a rational tactical purpose for stipulating to Lopez's assault. We leave for habeas the question of whether Jasso has demonstrated constitutionally deficient performance on this record.

The same is true as to counsel's stipulation to Jasso's assault on Mota. While here, the record does show that Mota refused to testify, there is at least a reasonable chance that the jury would have learned about Jasso's assault on Mota through other live testimony. Mota initially communicated through his attorney that he was scared to testify, stating, "I don't want to recall the past and what had happened." When testifying before the jury and on cross-examination, Mota maintained that he could not remember anything about the incident or what he had told deputies about it afterward. But before any of the inmates Jasso had harmed in jail were called to testify, the prosecutor stated that he had subpoenaed all of them and that it might be necessary "to call correctional witnesses who were there, took statements and to testify as to what they observed in the need to impeach the victim with regard to what happened." The trial court then indicated the victim's statements in the immediate aftermath could be introduced as "prior inconsistent statements" depending on their testimony. After Mota testified, the trial court concluded that Mota's statements to deputies after the attack were admissible as prior inconsistent statements.

Jasso does not argue that the trial court was wrong to see Mota's prior statement about the attack as a prior inconsistent statement, and the prosecution could have asked a responding deputy to testify about the Mota incident. As with the Lopez stipulation, counsel may have made a rational tactical choice to avoid live testimony about the incident and have the jury learn about it through a stipulation instead. Here as well the record does not affirmatively show that counsel's decision to stipulate was without any conceivable tactical basis.

We cannot definitively conclude on this record that counsel's stipulations as to Jasso's assaults on Lopez and Mota were the result of deficient performance. As is typically the case, Jasso's claims are more appropriate for resolution on habeas, where a more complete record can be made.

### 2. Asserted Prosecutorial Misconduct During Penalty Phase Argument

Jasso argues that the prosecutor improperly commented on Jasso's failure to testify in his penalty phase closing argument, violating Jasso's Fifth Amendment right not to testify against himself. Jasso acknowledges that his trial counsel did not object when the prosecutor made the remarks he now challenges, but again argues that counsel was ineffective for not objecting. We reject the claim.

### a. Background

The prosecutor's penalty phase closing arguments included the following remarks: "Then we have Martin Mota. I think it's important that you understand here that the defendant found himself in the ad seg unit. Right? And we know who goes there. We know who goes to ad seg. People who need protection or people who are violent. Right? People who have targets on them and people who target other people. I'll let you decide which one you think Christopher Jasso is. Person with a target on his back or a person who targets other people.

"We know with Martin Mota, that what the doctor told us simply wasn't the case. Right? He attacked him because of who he thought he was. Martin Mota had been convicted of nothing at the time of his attack. And that should be important to you, right? Important to you particularly in light of how the defendant handled his own case.

*"He was given his day in court. He had the opportunity to come in here and hold the People to our burden, right? He had the opportunity to say he didn't do it, to suggest Fabian Perez was the shooter. He had the opportunity to suggest that he was the one that called 9-1-1.*

"He didn't give Martin Mota that same opportunity. He was the judge, jury, at least in this case, attempted executioner. Right? We know what he did to Martin Mota. We know he did it. We saw the fingerprints on his throat. We saw the footprint on his back. And you got to see Martin Mota right up here. You tell me, is he scared? Is he intimidated of [*sic*] the defendant? He wouldn't even look at him." (Italics added.) Although Jasso's trial counsel objected during other parts of the prosecutor's closing argument, he did not object to any of these remarks.

### b. *Discussion*

Jasso argues that the italicized paragraph above was an improper comment on his decision not to testify, violating his Fifth and Fourteenth Amendment right not to testify against himself. (*Griffin v. California* (1965) 380 U.S. 609, 615.) But " 'a claim of prosecutorial misconduct is not preserved for appeal if defendant fails to object and seek an admonition if an objection and jury admonition would have cured the injury.' " (*People v. Tully* (2012) 54 Cal.4th 952, 1010, quoting *People v. Crew* (2003) 31 Cal.4th 822, 839.) Here, trial counsel failed to object, and we see no reason why a jury admonition would not have cured any potential injury. The claim of prosecutorial misconduct under *Griffin* is therefore forfeited.

Even setting forfeiture aside, the claim fails on the merits. While the prosecutor's comment that Jasso "had the opportunity to say he didn't do it" is a closer call, read in context, it is clear

that the passage as a whole was not commenting on Jasso's failure to testify. The prosecutor was instead commenting on Jasso's opportunity to have his day in court — an opportunity that, the prosecutor argued, Jasso had denied to Mota when he attacked him for the crimes of which Mota was accused. This is clear from the first line of the challenged comments: "He had the opportunity to come in here and hold the People to our burden, right?" Given the context, the prosecutor's further mentions of Jasso's opportunity to argue that Perez was the shooter and that he had called 911, are naturally understood as references to Jasso's ability to present a defense at trial, and not as commentary on Jasso's failure to take the stand. As the Attorney General notes, the prosecutor's statements "were part of a larger argument that appellant would remain a danger to others if sentenced to life in prison because appellant routinely resorted to extreme violence against any person he *suspected* was guilty of a crime." We agree that the jury would have understood the prosecutor's comments in this light, and not as improper commentary on Jasso's failure to testify in his defense. There was thus no *Griffin* error, and Jasso's counsel was not ineffective for failing to object.

### 3. *Challenges to California's Death Penalty Law*

Jasso presents several challenges to California's death penalty statute that we have rejected in previous decisions. He provides no persuasive ground to revisit our earlier holdings.

" 'California's death penalty law "adequately narrows the class of murderers subject to the death penalty" and does not violate the Eighth Amendment. [Citation.] Section 190.2, which sets forth the circumstances in which the penalty of death may be imposed, is not impermissibly broad in violation of the Eighth

Amendment.' " (*People v. Helzer* (2024) 15 Cal.5th 622, 677 (*Helzer*), quoting *People v. Williams* (2013) 58 Cal.4th 197, 294.)

" 'Allowing the jury to consider the circumstances of the crime ([Pen. Code,] § 190.3, factor (a)) does not lead to the imposition of the death penalty in an arbitrary or capricious manner.' " (*Helzer*, *supra*, 15 Cal.5th at p. 678, quoting *People v. Kennedy* (2005) 36 Cal.4th 595, 641.) Therefore, it does not violate the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution. (See, e.g., *People v. Linton* (2013) 56 Cal.4th 1146, 1214–1215 (*Linton*) [collecting cases so holding].)

" ' "Neither the federal nor the state Constitution requires that the penalty phase jury make *unanimous* findings concerning the particular aggravating circumstances, find all aggravating factors *beyond a reasonable doubt*, or find beyond a reasonable doubt that the aggravating factors *outweigh* the mitigating factors." ' [Citations.] ' "The United States Supreme Court's recent decisions interpreting the Sixth Amendment's jury-trial guarantee [citations] do not alter these conclusions." ' " (*People v. Johnson* (2022) 12 Cal.5th 544, 636, quoting *Linton*, *supra*, 56 Cal.4th at p. 1215.) Moreover, "[t]he lack of written or other specific findings by the jury regarding aggravating factors" does not violate "federal due process and Eighth Amendment rights to meaningful appellate review, violate equal protection of the laws or violate defendant's Sixth Amendment right to trial by jury." (*Linton*, at p. 1216; accord, *Helzer*, *supra*, 15 Cal.5th at p. 678.) Intercase proportionality review is also not required to pass federal or state constitutional muster. (*Johnson*, at p. 636.)

" ' "At the penalty phase, the jury properly may consider a defendant's unadjudicated criminal activity and need not agree unanimously or beyond a reasonable doubt that the defendant committed those acts." ' " (*People v. Charles* (2015) 61 Cal.4th 308, 337 (*Charles*), quoting *People v. Banks*, *supra*, 59 Cal.4th at p. 1207.)

" 'The adjectives "extreme" and "substantial" in statutory mitigating factors (d) and (g) of section 190.3 do not prevent the jury from considering mitigating evidence.' " (*Helzer*, *supra*, 15 Cal.5th at p. 678, quoting *People v. Leonard* (2007) 40 Cal.4th 1370, 1429.) Moreover, " '[t]he court need not instruct the jury that mitigating factors can be considered only in mitigation, or to omit mitigating factors that do not apply to defendant's case.' " (*Charles*, *supra*, 61 Cal.4th at p. 337, quoting *People v. Boyce* (2014) 59 Cal.4th 672, 724.)

Nor do the Eighth and Fourteenth Amendments preclude imposition of the death penalty on a defendant who unintentionally kills while committing a robbery: " 'Evidence that the defendant is the actual killer and guilty of felony murder . . . establishes "a degree of culpability sufficient under the Eighth Amendment to permit defendant's execution." ' " (*People v. Young* (2005) 34 Cal.4th 1149, 1204; accord, *People v. Contreras* (2013) 58 Cal.4th 123, 165.) If the jury found that Jasso actually killed Cardona while committing or attempting a robbery, it was not also required to find that Jasso specifically intended to kill Cardona before sentencing Jasso to death. The same is true if Jasso was not the actual killer but was a major participant in the robbery who acted with reckless indifference to human life.

" 'Prosecutorial discretion to select those death-eligible cases in which the death penalty will actually be sought is not constitutionally impermissible.' " (*People v. Baker* (2021) 10 Cal.5th 1044, 1113 (*Baker*), quoting *People v. Anderson* (2001) 25 Cal.4th 543, 601.)

" 'California's capital sentencing procedures do not violate principles of equal protection of the law on the ground they provide safeguards different from those found in noncapital cases.' " (*Linton, supra*, 56 Cal.4th at p. 1216, quoting *People v. Williams* (2008) 43 Cal.4th 584, 650.)

"Finally, California's death penalty does not violate international law or international norms of decency." (*Helzer, supra*, 15 Cal.5th at p. 678; see also *Baker, supra*, 10 Cal.5th at p. 1114 [stating that California's death penalty scheme is consistent with international and prevailing decency norms and collecting cases stating the same].)

### 4. Asserted Cumulative Error

Finally, Jasso argues the cumulative effect of error during both the guilt and penalty phases of his trial requires reversal. We have found or assumed only four nonforfeited errors: (1) the admission of certain statements made by Fabian Perez to Manuel Rivera; (2) the admission of Benjamin Pinela's statements to Jack Duke; (3) the retroactively erroneous felony-murder instructions; and (4) the potentially misleading CALCRIM No. 400 instruction. We have concluded that none of these found or assumed errors were individually prejudicial. Neither are the found or assumed errors prejudicial when considered cumulatively.

### 5. *Limited Remand*

Although we have concluded that Jasso is not entitled to reversal of his murder conviction or sentence in this automatic appeal, the Attorney General concedes that Jasso is entitled to a limited remand to allow the trial court to exercise discretion newly conferred by the Legislature to decide whether to strike Jasso's firearm enhancements. We agree, and accept the concession.

At the time Jasso was sentenced, his firearm enhancements under Penal Code sections 12022.53 and 12022.5 were mandatory. (See Pen. Code, former §§ 12022.5, subd. (c), 12022.53, subd. (h).) Effective January 1, 2018, Senate Bill No. 620 (2017–2018 Reg. Sess.) (Senate Bill No. 620) amended Penal Code sections 12022.53 and 12022.5 to provide "in the interest of justice pursuant to Section 1385," the discretion to "strike or dismiss an enhancement otherwise required to be imposed by this section." (Stats. 2017, ch. 682, §§ 1, 2; Pen. Code, §§ 12022.5, subd. (c), 12022.53, subd. (h).) Because Jasso's judgment of conviction was not final when Senate Bill No. 620 took effect, he is entitled to retroactive application of its grant of discretion to strike the firearm enhancements. (See *People v. Brown* (2012) 54 Cal.4th 314, 323–324.)

A remand is required unless the record shows that the trial court clearly indicated when it originally sentenced Jasso that it would not in any event have stricken the firearm enhancement. (See *People v. Mataele* (2022) 13 Cal.5th 372, 437.) As the Attorney General concedes, nothing in the record rules out the possibility that the court would exercise its discretion to strike the firearm enhancements. A limited remand is appropriate to allow the trial court to consider

whether to exercise its discretion to strike the firearm enhancements. (*Id.* at pp. 437–438; see *People v. McDavid* (2024) 15 Cal.5th 1015, 1020; *People v. Tirado* (2022) 12 Cal.5th 688, 700.)

## III. DISPOSITION

We affirm the death judgment and remand to allow the trial court to consider whether to strike the firearm enhancements under the discretion conferred by Senate Bill No. 620.

**KRUGER, J.**

**We Concur:**

**GUERRERO, C. J.**
**CORRIGAN, J.**
**LIU, J.**
**GROBAN, J.**
**JENKINS, J.**
**EVANS, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  People v. Jasso

_____

**<u>Procedural Posture</u>** (see XX below)
**Original Appeal** XX
**Original Proceeding**
**Review Granted (published)**
**Review Granted (unpublished)**
**Rehearing Granted**


_____

**Opinion No.** S179454
**Date Filed:** April 3, 2025

_____

**Court:**  Superior
**County:**  Riverside
**Judge:**  Richard A. Erwood

_____

**Counsel:**

Glen Niemy, under appointment by the Supreme Court, for Defendant and Appellant.

Kamala D. Harris and Rob Bonta, Attorneys General, Gerald A. Engler and Lance E. Winters, Chief Assistant Attorneys General, Julie L. Garland and James William Bilderback II, Assistant Attorney General, Holly D. Wilkens, Meredith S. White, Michael T. Murphy and Paige B. Hazard, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Glen Niemy
Attorney at Law
8 Main Street #201
Berwick, ME 03901
(207) 699-9713

Paige B. Hazard
Deputy Attorney General
600 West Broadway, Suite 1800
San Diego, CA 92101
(619) 738-9053